## VENNER v. ATCHISON, T. & S. F. R. Co. and others.

*(Circuit Court, D. Kansas. 1886.)*

1. RAILROAD COMPANIES—CHARTER—PURCHASE OF ROAD IN ANOTHER STATE—CONNECTING LINES.

   The charter of a Kansas railroad (Terr. Laws 1859, c. 47) authorized it, among other things, "to construct a branch to any point on the southern boundary of Kansas *in the direction of the Gulf of Mexico;*" to make necessary contracts, etc., with other railroads *intersecting or connecting* with it, for "running their road in connection with other roads in other states," etc. The legislature subsequently (Laws 1873, c. 105, § 1) passed a general law making it lawful for any railroad to purchase or guaranty the stock or bonds of any connecting or intersecting road. The railroad in question bought out a railroad incorporated in Texas, to which congress (St. at Large 1883–84, c. 177) had granted a right of way, through the Indian Territory, to the southern boundary of Kansas. *Held*, that the purchase was within the power of the Kansas company. *Atchison, T. & S. F. R. Co.* v. *Fletcher*, 10 Pac. Rep. 596.

2. SAME—CHARTER—AMENDMENT TO CHARTER—ACCEPTANCE.

   The board of directors of a corporation, who, under the charter, are vested with "*all* the corporate powers" of the company, may not, as a general rule, have the incidental power of accepting from the legislature an amendment to the charter, the effect of which is to enlarge beyond the wish of the stockholders the extent and variety of the company's business and investments, yet under the circumstances of the case it must be held that there had been such acquiescence by the stockholders as to constitute an acceptance by the corporation beyond the challenge of the present plaintiff, a recent purchaser of stock.

3. SAME—ASSUMED POWERS—STOCKHOLDER—NOTICE.

   Where a stockholder buys into a railroad corporation, with knowledge that it is acting on an assumed power to invest in the stock of railroad corporations outside the state of its creation, his purchase under such circumstances will be regarded as an implied recognition on his part of such assumed power.

4. SAME—STOCKHOLDERS—DOUBLING STOCK—ESTOPPEL.

   Stockholders who have voted for an unauthorized doubling of stock by their company, or who have voluntarily accepted the benefits of such action, or who bought into the corporation subsequent to the issuance of such stock, are estopped, as against the corporation, to contest the legality of such action.

5. COURTS—FEDERAL COURTS—DECISIONS OF STATE COURTS—STATE STATUTES.

   The decisions of the highest court of a state upon the interpretation of the statutes of that state granting certain powers to a corporation of its own creation, though not conclusive upon the federal courts sitting in that state, are most persuasive.

6. EQUITY—DISCOVERY—RELIEF.

   Where a bill in equity asks for discovery as well as for relief, but is substantially a bill for relief, if it is insufficient for relief it also fails for discovery.

In Equity. On demurrer to bill.

*J. H. Benton, Jr., W. A. Underwood,* and *Joseph G. Waters,* for complainant.

*George R. Peck* and *George W. McCrary,* for defendants.

BREWER, J. The bill is filed by Clarence H. Venner, a citizen of Massachusetts, against the Atchison, Topeka & Santa Fe Railroad Company, its secretary, and three of its directors, all citizens of the state of Kansas. Complainant alleges that on the fifteenth day of

February last he became the owner of 500 shares of the defendant company's stock, and, as such stockholder, challenges the recent action of said company in the acquisition of the stock of the Gulf, Colorado & Santa Fe Railway Company. To this bill a demurrer has been filed on the two grounds of a lack of indispensable parties, and a want of equity.

Passing the first ground, I proceed to inquire into the second, for it involves the merits of this controversy. The bill states, upon information and belief, the financial condition—the earnings and expenses—of the Gulf, Colorado & Santa Fe Company, for the purpose of showing the financial injury to the defendant company resulting from any investment of its means in the stock of such company. It further alleges that said Gulf Company is a corporation organized under the laws of Texas, and that on the fifteenth day of February, 1886, it was authorized to and had built and owned and operated about 551 miles of railroad in the state of Texas; that its said lines at no place intersected or connected with any of the lines of railroad which the said defendant company was or is authorized to build, own, operate, or maintain; but that, on the contrary, the nearest point on any of the lines of the said Gulf road was distant from the said defendant company's lines at least 350 miles, and separated by the whole width, from north to south, of the Indian Territory, and a long distance in northern Texas; that since said fifteenth day of February the defendant company has made some arrangement or agreement, of the exact nature and terms of which complainant is ignorant, and has been unable after diligent inquiry to ascertain, but that a part of it involves the issue of additional stock of defendant company and the exchange thereof for the stock of the Gulf Company; that in pursuance of such arrangement about $4,000,000 of defendant company's stock has been already issued and exchanged for stock of the Gulf Company; that $3,500,000 more of stock of said defendant company has been issued and placed in the hands of the Farmers' Loan & Trust Company of New York city for the use and benefit of the holders of the stock of said Gulf Company, and to be delivered on or about the first day of January, 1887, and that the directors of said company are about to issue and deliver other and further certificates of stock for the same purpose, and also that the defendant company is now engaged in operating the railroad of said Gulf Company, using its own means therefor, and putting at risk its property and credit thereby. Complainant denies the power of the defendant company to acquire any interest in, or assume any control or responsibility for, the Gulf Company, and also denies the power of the defendant company to issue any more stock.

He thus challenges both defendant's power of acquisition and its method of acquisition. Naturally, the first inquiry runs to the question of power. The primal source of power is, of course, the defendant's charter. That is its grant, defines the extent and prescribes

the limitations thereof.   This charter was granted by the territorial legislature of 1859.   Laws 1859, *c.* 47.   The first section provides for the organization.   The second and twentieth read as follows:

"Sec. 2. The said company is hereby authorized and empowered to survey, locate, construct, complete, alter, maintain, and operate a railroad, with one or more tracks, from or near Atchison, on the Missouri river, in Kansas territory, to the town of Topeka, in Kansas territory, and to such point on the southern or western boundary of said territory, in the direction of Santa Fe, in the territory of New Mexico, as may be most convenient and suitable for the construction of such railroad, and also to construct a branch of said railroad to any points on the southern boundary of said territory of Kansas in the direction of the Gulf of Mexico."

"Sec. 20. This company shall have power to make such contracts and arrangements with other railroads which connect with or intersect the same as may be mutually agreed upon by the parties, for leasing or running their roads, or any part thereof, in connection with other roads in other states, and shall be empowered to consolidate their property and stock with each other; such consolidation to take place whenever such companies shall respectively agree upon the terms and conditions, and shall have all the powers, privileges, and liabilities that they may hold by their separate charters, by filing a copy of such articles of consolidation in the office of the secretary of this territory."

Now, were all the powers possessed by the defendant company those given by its charter, it might well be doubted whether, tested by the rule that nothing passes by a charter except that which is clearly and expressly granted, the power to acquire possession of this Texas road existed.   It is true that an argument of some plausibility might be based upon the charter provisions alone in support thereof. The second section in plain terms grants the power to construct roads to the western and southern boundaries of the state, in the direction of Santa Fe and the Gulf of Mexico.   The state boundaries are doubtless, under this, the limits of construction, yet the further points named are suggestive of an expectation that these state roads would one day become parts of transcontinental lines, and to that extent indicative of a thought that the company is given, or, if not already given, is in the future to receive, whatever powers may be necessary to bring about a realization of such expectation.   It is well said by the supreme court of this state in the opinion written by its learned chief justice in the recent case of *Santa Fe R. Co.* v. *Fletcher,* 10 Pac. Rep. 596, referring to this matter:

"In interpreting the powers possessed by a corporation, we must look to the intention of the legislature in the enactment of the statute.   It is manifest that the legislative assembly of the territory of Kansas, in granting the charter to the Atchison Company, anticipated that some day the road would become a part of a transcontinental line, and thereby that Kansas, by reason of its geographical location, would have passing over it the great traffic of the country, east and west, north and south, because it provided for building its road in the direction of Santa Fe and also of the Gulf of Mexico."

A similar recognition of a suggested, though unexpressed, purpose is found in the case of *Green Bay, etc., R. Co.* v. *Union, etc., Co.,* 107 U. S. 101, S. C. 2 Sup. Ct. Rep. 221, in which the court says:

"These statutes show that the legislature of Wisconsin, recognizing the fact that from the geographical situation of the state the railroads which traverse it from east to west form.part of the line of transportation extending across the continent, intended to confer upon the corporation owning such railroads very large powers of contracting with other corporations owning railroads or steam-boats whose course includes connecting parts of the same great line of transportation."

In the first section of this charter the power is granted "of acquiring, by purchase or otherwise, and of holding or conveying, real and personal estate which may be needful to carry into effect fully the purposes and objects of this act." In the case of *Ryan* v. *Leavenworth, A. & N. W. Ry. Co.*, 21 Kan. 365, similar language was held broad enough to grant the power of purchasing the stock of a connecting railroad company.

Further, with prophetic vision of its large, though as yet unknown, future, unwilling that any prescribing limitation of its capital stock should bar or hamper its hoped-for expansion, the legislature, in section 5, made a singular and elastic provision as to such stock. The section reads:

"The capital stock of said corporation shall be one million and five hundred thousand dollars, which may be increased from time to time to any sum not exceeding the amount expended on account of said road, divided into shares of one hundred dollars each, which shall be deemed personal property, issued and transferred as may be ordered by the directors or by-laws of said company."

Under this the capital stock might be increased indefinitely, yet only *pari passu* with the extension of the railroad lines and property. Now, with these indications of its purpose and expectation, the legislature adds to the charter, as its last granting section, section No. 20, above quoted. This gives general powers of contract and arrangement, with other railroad companies owning connecting or intersecting lines, for leasing or running their roads, and also gives the right of consolidation. No limitation to home corporations is expressed. The only expressed limitation is to companies having connecting or intersecting lines. That such contracts and arrangements may extend to establishing connections with roads in other states is declared. It is doubtless true that, from the silence as to extraterritorial corporations, there may be some implication that only home companies were within the contemplation of the legislature, and it is also true that the provisions as to consolidation seem more peculiarly applicable to home corporations. But with the purpose so obviously disclosed in the prior sections it would be no severe strain on language to hold that this was intended as a grant of power to obtain, by lease or other contract, the lines of extraterritorial corporations, providing they were connecting with that of defendant company.

It may be, however, that these various provisions only carry up to the point of expectation, and stop just this side of an express grant of power. Be it so. They plainly disclose the thought of the legis-

lature, and give clear notice to any desiring to invest in the stock of the company, of a willingness to grant in the future all powers needful to carry into effect such purpose.

But, if the power be doubtful under the charter, it is clear under subsequent legislation. Chapter 105, § 1, Laws 1873, reads "that it shall be lawful for any railroad company created by or existing under the laws of this state, from time to time, to purchase and hold the stock or bonds, or either, or to guaranty the payment of the principal and interest, or either, of the bonds of any railroad company or companies, the line of whose railroad, constructed or being constructed, connects with its own."

That the legislature may by general law grant additional powers to any existing corporation, whether created under general laws or by special charter, is settled by the decision in *Railroad Co.* v. *Railroad Co.*, 26 Kan. 680. This section contains a grant of power to any railroad company. It is a grant to defendant company. It may therefore purchase and hold the stock and bonds, or either, of any road whose line, constructed or being constructed, connects with its own. The Gulf Company is a Texas corporation. It is by act of congress authorized to extend its line, through the Indian Territory, to the southern boundary of the state of Kansas. St. 1883–84, c. 177.

Both the defendant and the Gulf Company are therefore authorized to build to the southern boundary of this state. Their authorized lines connect. As the court takes judicial notice of these statutes, it is scarcely necessary to waste any time in inquiring whether the language of the bill denying any connection between the lines of the two companies refers other than to constructed lines. Granting the validity of these statutes,—and I see no reason to doubt their validity,—it would seem that there could be little question of the power of the defendant company to acquire the control of the Gulf Company by the purchase of its stock and bonds, or either, and, with the control, assume all the responsibilities of control. This conclusion is in harmony with the recent decision of the supreme court of this state in the case of *Santa Fe, etc., R. Co.* v. *Fletcher, supra.*

Indeed, if this *Fletcher Case* be accepted as controlling in this court, there would be little need for any personal examination of the question. But counsel for complainant earnestly insist that it is not controlling, and should not be followed. They urge that it was rendered after complainant, a non-resident, had acquired his interest in the property, and may therefore not be invoked in the federal court to his detriment; that it was not rendered upon a final hearing, but only upon an application for a preliminary injunction,—was therefore possibly not carefully considered, and may be changed by that tribunal upon the final hearing; and, finally, that it is contrary to the general course of decision elsewhere, and is not a correct declaration in respect to corporate charters and powers. They say:

"There were on the tenth of April, when it was rendered, about 10,000 stockholders in the Atchison Company, about 9,500 of whom were citizens of other states than Kansas. Were the relations of these stockholders to the corporation bound by the decision of the state court?"

I must dissent, in the main, from these views. That decision, if not absolutely controlling, is certainly most persuasive in this court. Under the practice obtaining in this state, which permits an independent review in the supreme court of a preliminary ruling of the trial court, the questions presented are considered as submitted for final adjudication as fully as though it was a proceeding to review a final judgment, and receive the same examination and careful attention. Further argument in the court in any subsequent progress of the case will not be heard. The question is settled. Examination of the opinion shows that it was carefully prepared, and had received that full examination at the hands of the court which its importance deserves. It has become the law of the matter for the state tribunals. As such, very cogent reasons should exist before any federal court should be at liberty to disregard it. It contains an interpretation of the statutes of the state by its highest tribunal. It declares what powers the state has given to one of its corporations; and, when a state affirms that it has granted certain powers to one of its creatures, it would be something of an anomaly for the courts of another jurisdiction to declare that it has granted no such powers. Whenever differences have arisen between the state and federal courts, generally, they have sprung from a denial by the state tribunal of the grant or existence of powers whose grant or existence has been deemed by the federal tribunals essential to preserve the rights of alien litigants. The question involved is not a federal question, and cannot, therefore, be taken from the state to the United States supreme court for review. Unless the federal tribunals follow, in this matter, the rulings of the state supreme court, there will inevitably be two opposing lines of decision. Very little reflection will show to what confusion and injustice such conflict will lead. The Gulf Company is not a citizen of Kansas. Some, perhaps all, of its stockholders may also be non-residents of the state. As such, they cannot be brought into this court, nor their rights determined by any decision in this case. Suppose they go into the courts of the state to compel the Santa Fe Company to carry out its contract by the issue of stock, and afterwards to compel a share in the dividends, a decision rendered here would be no bar to such actions. It would be, as to those plaintiffs, *res inter alios acta;* and the courts of the state would compel the issue of stock and the payment of dividends to those non-residents, according to its own notions of the validity of the original contract, and its determination of the powers granted to the Santa Fe Company. I need not pursue this thought at length. A little reflection will suggest to any one both the details and extent of the confusion and injustice which might follow, unless this court followed the state su-

preme court in its exposition of the powers granted by state action to a state corporation. It also suggests the aptness of the first ground of demurrer presented, viz., a lack of indispensable parties. So I think that that decision should be followed by this court.

Certain am I, at least, that I should follow it unless I was very clearly convinced that it was erroneous, and in this I but listen to the voice of the United States supreme court. In the recent case of *Burgess* v. *Seligman*, 107 U. S. 20, S. C. 2 Sup. Ct. Rep. 10, in which that court enunciated, perhaps, its most extreme views as to the duty of independent judgment by the federal tribunals, I find this cautionary language:

"But even in such cases, for the sake of harmony and to avoid confusion, the courts of the United States will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt.

"Acting on these principles of comity, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts."

Again, it is urged that, if this power be given by subsequent legislation of the state, it is not a power which can be forced upon the corporation, but requires its acceptance, and that such acceptance must be made by the stockholders, and cannot be by the directors. It is alleged in the bill that the stockholders have never acted; that the complainant tried to bring the matter up in a meeting of the stockholders, but was thwarted.

The argument, as forcibly put by counsel, is substantially this: The charter is a contract between the state and the corporation. No power to alter or amend being reserved, it is inviolable, and cannot be changed without mutual consent. No powers, rights, or duties can be enlarged or abridged by the act of the state alone. And when an act of incorporation is passed, and a corporation is organized under it, another contract arises between the corporation as a person, and its stockholders, and it has been well said that "the relation between the corporation and the stockholders is one of contract. The stockholder subjects his interest to the control of the proper authorities, to accomplish the object of the organization, but he does not agree that the purpose shall be changed in its character at the will of the directors, or a majority of the stockholders, even. The contract cannot be changed without the consent of both contracting parties." *Clearwater* v. *Meredith*, 1 Wall. 25; *Hartford & N. H. R. Co.* v. *Crosswell*, 5 Hill, 385; *McCray* v. *Junction R. Co.*, 9 Ind. 358; *Winter* v. *Muscogee R. Co.*, 11 Ga. 438; *Middlesex Turnpike Co.* v. *Locke*, 8 Mass. 268. See authorities cited in note 6, pp. 77, 78, Green's Brice, Ultra Vires. See authorities in note 40 Amer. Dec. 358, 359, note 32 Amer. Dec. 717, note 33 Amer. Dec. 604, 41 Amer. Dec. 341, and 47 Amer. Dec. 129; *Zabriskie* v. *Hackensack & N. Y. R. Co.*, 18 N. J. Eq. 178. And amendments which are fundamental

in their nature must be accepted by all the stockholders. *Buffalo, etc., R. Co.* v. *Dudley,* 14 N. Y. 336; *Kenosha, etc., R. Co.* v. *Marsh,* 17 Wis. 13; *Sprigg* v. *Western Tel. Co.,* 46 Md. 67.

And, in further consideration, the case of *City of Knoxville* v. *Railroad Co.,* 22 Fed. Rep. 758, is cited, in which it appears that the city of Knoxville was a stockholder in the Knoxville & Ohio Railroad Company,—a company incorporated under special charter,—and filed a bill to restrain certain acts of the corporation which were claimed by the company to be authorized by subsequent legislation. In the opinion given by Judge BAXTER he says:

"But it was not competent for the legislature to do more in this respect than to waive the public rights. It could not divest or impair the rights of the shareholders, as between themselves, as guarantied by the company's charter, without their consent. It was upon the faith of the stipulations contained in said charter that the shareholders subscribed to the capital stock, and thereby made themselves members of the corporation. These stipulations, as we have already seen, contemplated and provided for the construction of a railroad between the *termini* named, to be governed by the shareholders in the manner and upon the terms prescribed. Each corporator is entitled to have the contract fairly interpreted and honestly enforced. The charter invests the owners of a majority of the capital stock with the right to control the corporate business within the scope of its provisions. Within this limit, the power of a majority, when acting in good faith, is supreme."

And Judge BAXTER continues:

"To hold otherwise would be to divest them [the stockholders] of their vested rights, and force them into a relation, and subject them to duties and obligations, which they have not, and probably would not have, voluntarily assumed."

So, in this case, the power to make this investment not being one of the charter powers, subsequent legislation could not force the power upon the corporation, nor could it be accepted by the corporation, save only through the action of the stockholders. This seems to me the strongest point in complainant's case. It is the one which has given me the most doubt and embarrassment. Still, after much reflection, I am constrained to hold against the complainant in this matter also.

The power given to the directory by the charter is broad: "All the corporate powers of said company shall be vested in and exercised by a board of directors, and such officers and agents as they may appoint." Section 6. This is significantly different from the language in the general corporation law of the state, which provides that "the directors or trustees shall have the general management of the affairs of the corporation, and may dispose of the residue of the capital stock at any time remaining unsubscribed in such manner as the by-laws may prescribe." Comp. Laws 1879, p. 219, § 23. Now, the power to accept an amendment to its charter is one incidental to a corporation. *Railroad Co.* v. *Hatch,* 1 Disney, 85; *Gray* v. *Navigation Co.,* 2 Watts & S. 156.

It is urged, however, that the words "all the corporate powers" should be held to refer solely to the powers expressly granted by the charter, and should not be broadened to include the incidental power of accepting an amendment which might enlarge beyond the thought or wish of the stockholders the extent and variety of the company's investments and business. *Railway Co.* v. *Allerton*, 18 Wall. 233. Be it so,—and there is doubtless force in this suggestion against the comprehensiveness of the word "all" as used in the section quoted,—we immediately run against matters heretofore noticed, to-wit, the thought and expectation, evident in the charter, of a future transcontinental line, and the indefiniteness of the grant of powers in the twentieth section.

Again, the complainant is a recent purchaser of defendant's stock. In his bill he avers that prior to his purchase the defendant company had been issuing and disposing of stock, "some for cash, and some in exchange for the stocks of various other railroads in Kansas, Colorado, New Mexico, Arizona, and Old Mexico, so that on the fifteenth day of February, 1886, when your orator became the owner of said shares of stock in the first paragraph mentioned, the stock claimed to be issued and outstanding amounted to $56,913,750." He thus purchased with notice that the defendant company was acting upon the assumption that among its corporate powers was that of investing its properties in the stock of extraterritorial railroad corporations. It would seem as though his purchase under such circumstances was an implied recognition of the existence of such assumed power; for, of course, it would not be tolerable for a party to buy into a company with the purpose of invoking the aid of the courts to compel the company to desist from a policy which it was pursuing satisfactorily to its then stockholders. If this power, even though granted by subsequent legislation, had been legally and fully accepted by the corporation and all its stockholders, it would seem fairly to be classed among "all the corporate powers," and to be vested in and exercisable by the directors. Of course, I know that all this is subject to the rule that assent goes only to that which is accomplished, and does not reach to that as yet unattempted. Further, I have no doubt that the power to do that which is here complained of, if not granted by the original charter, could, when granted by subsequent legislation, be accepted by a majority of the stockholders, and that it is not a power so foreign to the purposes and scope of the charter as to require the assent of all the stockholders.

Now, from the bill, it appears that complainant heard of this proposed contract and agreement some time prior to the annual meeting of the stockholders on the fifteenth of April; that he sent protests to the officers; that he endeavored to ascertain the full facts, but failed; that he attended the annual meeting, at which the annual report was presented; and that his efforts looking in the direction of an investigation into this matter were thwarted, and the meet-

ing adjourned without paying much attention to him or his efforts. While the details of the meeting may not be fully disclosed, yet enough appears to show that the stockholders present were not in sympathy with complainant, and were content with what was being done by the directors. It is true, the number of stockholders and the amount of stock represented at such annual meeting is not disclosed; neither does it affirmatively appear that the facts concerning this contract and arrangement were known, even in their general features, by those present; so that it cannot be affirmed that it clearly appears that, when both the opportunity and duty of speech existed, a majority of the stockholders, by their silence, approved the action of the directors. Yet enough is disclosed to justify a presumption, in the absence of positive allegations to the contrary, that the majority of the stockholders approve of what is being done. Under these circumstances, while conceding the general proposition that a new grant of independent powers requires acceptance by the stockholders, I must, in this, also find for the defendants.

The remaining matter to be considered is the method of acquisition. The bill avers that it is by the issue of new stock of the defendant company. The power to do this is denied. Whatever stock the company has power to issue, the directors are authorized to issue. Charter, § 5. So the question is narrowed to that of the power of the company. The bill charges that the total cost of construction, etc., up to December 31, 1885, was $52,005,583.67, and at the same time the bonded indebtedness was $53,539,000; that on October 7, 1881, the capital stock amounted to $34,000,000, and that on that day a resolution was passed, under the authority claimed by section 14 of article 3 of chapter 23, to double the stock, and that from that time the defendant company has claimed that its authorized stock was $68,000,000; that, after the passage of such resolution, the directors distributed among the then stockholders $15,720,000 of this stock as a stock dividend, and without any pretense of receiving any consideration therefor; and that the amount of stock outstanding prior to this contract and agreement complained of was $56,913,000.

Section 14, above referred to, reads:

"Any corporation may increase its capital stock to any amount not exceeding double the amount of their authorized capital, by a vote of the stockholders in conformity with the by-laws thereof; and if a majority of stockholders shall vote for the increase of stock, the same may be increased by the board of directors, trustees, or other business managers of such corporation; and, upon such increase of stock being made in accordance with the by-laws, the date and amount of such increase shall be certified to the secretary of state by the directors or trustees, and from the time such certificate is filed the increase of stock shall become a part of the capital thereof. Such certificate shall be filed and recorded in the same manner as the charter."

Section 5 of the charter, heretofore quoted, while providing that in the inception of the company the capital stock shall be $1,500,000, authorizes its increase to "any sum not exceeding the amount ex-

pended on account of said road." There is no pretense that the $34,-000,000 of stock outstanding in October, 1881, was not valid and authorized, or that it exceeded the amount expended on account of the road; and it appears that a majority of the stockholders, in accordance with the by-laws of the company, voted for the increase then ordered, and that all practically approved of it by accepting the stock dividends based upon it.

Now, assuming that this action of the defendant company, in 1881, in doubling its stock, was unauthorized, who may challenge it? Undoubtedly the state can at any time, because it holds a supervising control over the action of all its corporations, and may, by suitable proceedings, compel all to keep within the limits of the powers it has granted to them. So might any one of the then stockholders who did not vote for or voluntarily accept the benefits of such action, providing, at least, he commenced early, and before vast rights and obligations had become vested and assumed on the faith of its validity. No action has been taken by any such parties. The complainant purchased his stock and became interested in the defendant company years after such action had been taken, after it had been acquiesced in by the state and all parties in interest, and after rights and obligations to an enormous amount had been created and assumed on the strength thereof. Indeed, for aught that appears, the stock which he holds may be stock issued solely by virtue of such action, and it would be an anomaly for the holder of such stock to deny the validity of the act which gave it birth, or, with only such standing, be permitted to restrain the full exercise of the powers claimed thereby. Even if we may presume that his purchase was of stock of an earlier issue and of unquestioned validity, he simply stands in the shoes of one who either directly voted for, or ratified by receiving the benefits of, such action, and will not be heard to now question its validity. He bought into the company with full knowledge that the authorized capital stock claimed by this company was $68,000,000; that this amount of stock was authorized by the direct action of a majority of the stockholders, and the ratifying approval of all through their receipt of a proportional share of the increase. Under those circumstances he is not at liberty to question the increase. It seems unnecessary, therefore, to inquire into the validity of the act by which the defendant company claims to have increased its capital stock to $68,000,-000.

My conclusion upon the whole matter is that the power of acquisition exists, and that complainant is not in a position to challenge the method of acquisition.

Finally, it is urged by complainant that this is a bill for discovery as well as for relief, and that, if not entitled to relief, he is to discovery, and therefore the demurrer should be overruled. I do not agree with this. The bill is substantially one for relief; the discovery sought is merely incidental to the relief. And when, under those

circumstances, the bill is insufficient for relief, it also fails for discovery. 1 Daniell, Ch. Pr. 547; Smith, Ch. Pr. 204.

The demurrer will be sustained.