CRAVENS v. CARTER-CRUME CO.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

No. 555.

1. TRIAL—OBJECTIONS TO EVIDENCE—SUFFICIENCY.

Error cannot be assigned upon the action of the court in receiving documents in evidence, where no ground for their exclusion is stated in the objection made.

2. MONOPOLIES — COMBINATION TO RESTRICT PRODUCTION—VALIDITY OF CONTRACTS.

At a convention of manufacturers of wooden ware, in which 80 per cent. of the production of the country was represented, a combination

was formed for the purpose of restricting the production of wooden dishes throughout the country, and keeping up the price thereof. To this end it was expected and intended that all the factories would be brought under the control of a central organization, which was to regulate the prices. The articles to which the combination related were such as are in common use. *Held*, that a contract made in pursuance of such combination, by which a manufacturer was guarantied a certain sum as dividends on his stock in the central company, in consideration of the closing of his factory for a year, was contrary to public policy, and therefore unlawful, and would not be enforced by the courts.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

Charles Cravens, plaintiff in error, a citizen of Indiana, doing business at Paducah, Ky., under the name of Charles Cravens & Co., brought this action against the Carter-Crume Company, a West Virginia corporation, the National Mercantile Company, an Ohio corporation, and the Crume & Sefton Manufacturing Company, another West Virginia corporation, to recover the sum of $9,000, which he claimed had inured to him under the guaranty of the Carter-Crume Company that the dividends upon certain stock, sold to him by contract between the National Mercantile Company and himself, should amount to the sum of $9,000 for the year then next ensuing. The National Mercantile Company demurred to the petition, and, the demurrer being sustained, the case was dismissed as to that company. The Crume & Sefton Manufacturing Company dropped out of the case by consent of parties. The Carter-Crume Company answered the petition, and the plaintiff replied. As no question arose upon the pleadings, and none of the errors assigned has relation thereto, it is unnecessary to give any detailed statement thereof. The only questions involved are such as arose upon the trial of the case, and they are based entirely upon the testimony. The facts as they appeared upon the trial were substantially these:

The plaintiff, Cravens, was, and for some time had been, engaged in manufacturing wooden dishes and dish machines at Paducah, Ky., at the time of the making of the contract of guaranty, which was on the 28th day of August, 1896. At that time there were also a number of parties engaged in the same kind of business at various other places scattered throughout the United States, principally in the northern portion thereof. One of these was the Carter-Crume Company, which, by its charter, was required to establish its principal office at Niagara Falls, N. Y. The president and secretary kept their offices at that place, but the vice president and manager had offices at Dayton, Ohio. Another of such manufacturers was the Crume & Sefton Manufacturing Company, the locality of whose principal office is not stated, but it appears to have been doing business at Dayton, Ohio. The National Mercantile Company was an Ohio corporation, having its principal office at Dayton, the majority of the stock in which was owned by parties largely interested in the other two companies just mentioned. William E. Crume, of the Carter-Crume Company, and John C. Crume, of the Crume & Sefton Company, were charter members thereof. William E. Crume was the secretary, and appears to have been largely influential in the direction of the management of the National Mercantile Company. He was also vice president of the Carter-Crume Company, and managed its affairs at Dayton, Ohio. The business for which the National Mercantile Company was incorporated is thus set forth in the third article of incorporation: "Said corporation is formed for the purpose of buying and selling and dealing in wooden ware and grocers' novelties." It was not a manufacturer. This corporation appears to have been formed for the purpose of creating a common controlling head, into connection with which the various manufacturers of wooden dishes throughout the country should, as far as possible, be brought, whereby the output and sale of their manufactures should be controlled in respect to quantity and price. The plaintiff, Cravens, after some preliminary negotiations with the parties representing the corporations doing business at Dayton, as above stated, went there on the date above mentioned, August 28, 1896, for the purpose of meeting and conferring with those parties and others

interested in the manufacture of wooden dishes and dish machines. A considerable number of such persons from different places in the country, representing about 80 per cent. of the entire output of wooden dishes in the country, convened there that day, and a meeting was held, which the plaintiff attended, for the purpose of effecting a combination whereby the output of their goods should be restricted and prices maintained. This plan involved the making of contracts by the manufacturers with the National Mercantile Company of a kind similar to that hereinafter stated between the plaintiff and the National Mercantile Company. Having taken some of the stock, the plaintiff was made a director of that company on that day.

The following is an extract from his testimony, as found in the bill of exceptions: "Q. Mr. Cravens, you were contemplating that deal before that? A. I was contemplating a deal with the National Mercantile Company. Q. You went down to Dayton for the purpose of getting into that deal? A. I didn't know. I was asked to go and attend a meeting. Q. In what way? A. A meeting of the different manufacturers. Q. How much of the output of the country was represented at that time? A. I could not say. Q. Have you no idea? A. (No response.) Q. What was the object of the meeting, as stated to you? A. Mr. Crume had been to see me; wanted me to go into the National Mercantile Company. He wanted me to put my factory in. My factory would represent so much stock. My dividend, he said, would amount to six thousand dollars or more. I refused to do it. I told him that I would if Carter-Crume Company would guaranty me nine thousand dollars. I would close my factory, and not run it at all. Q. You were made director of the National Mercantile Company? A. Yes, sir. Q. What was the object of that company, as you understood as a director? A. Well, I saw that they were then working to get all these factories in line. Q. For what purpose? A. They wanted to close my factory. Q. For what purpose? A. To get the factories all in line. Q. As you understand that, as a director of the company? A. They were to maintain prices. Q. And anything else, sir? A. What they wanted to do was to control the business at that time. Q. And that was the object of that meeting, was it not? A. That was the object of that meeting; yes, sir. Q. And you were director of the company? A. I was director of the company. I will state, though, before I went into that company I had the guaranty— I had Mr. Crume's word that Carter-Crume Company would guaranty me nine thousand dollars a year, if I did this. Q. You knew what you were going into? You made the proposition that, if they would guaranty this nine thousand dollars, you would close your factory? A. I was leasing them my machinery. Q. Didn't you know what the Mercantile Company was buying your factory for,—what you were going into it for? A. To get rid of my machinery; to get this nine thousand dollars. Q. Didn't Mr. Crume tell you what he wanted to do? A. That he wanted to get me in line. Q. What for? A. To maintain prices."

On the occasion of that meeting, the following contracts were entered into between the plaintiff and the other parties named therein:

#### "Contract.

"This agreement, entered into by and between the National Mercantile Company, a corporation by virtue of and under the laws of Ohio, with office at Dayton, Ohio, their successors or assigns, party of the first part, and Charles Cravens & Co., a co-partnership, of Paducah, Ky., parties of the second part, witnesseth:

"(1) That party of the first part being desirous of leasing all the wood-dish machines now owned or controlled by the party of the second part, and the party of the second part being desirous of renting said machines to the party of the first part, it is hereby agreed that, for the sum of one dollar ($1.00) and other valuable considerations, the party of the second part agrees to · lease, and does hereby lease, to the party of the first part, all the wood-dish machines now owned or controlled by it, and all the wood-dish machines that may, during the continuance of this contract, come into the possession or control of the party of the second part.

"(2) It is also agreed and understood that the said machines shall remain

in the possession and control of the party of the second part, and it agrees to operate and keep in repair the said machines, and proceed to make wood dishes for the party of the first part, on the following terms and conditions:

"(3) The wood dishes shall be made of gum and maple wood, all light in color, all first quality, and satisfactory to the general trade, and they shall be securely packed in good, substantial crates, containing 250 or 500 dishes, as may be, from time to time, specified by first party. If packed in crates, the crate heads shall be planed, branded, and stenciled as instructed by the party of the first part.

"(4) The party of the first part agrees to take wood dishes per year during the continuance of this contract, which shall be distributed as near as may be to dishes daily.

"(5) It is hereby agreed that the price to be paid f r said wood dishes shall be: No. 1-2's, 65c.; No. 1's, 65c.; No. 2's, 75c.; No. 3's, 85c.; No. 5's, $1.05,—per thousand, f. o. b. cars at factory point, and shipped as per instructions from party of the first part; shipping bill, together with invoice, to be promptly mailed to party of the first part. Terms: Cash ten days after date of bill of lading.

"(6) In consideration of the large quantity of wood dishes purchased by the party of the first part, the party of the second part agrees that it will not make for or sell wood dishes, directly or indirectly, to any other person, firm, or corporation.

"(7) The dishes purchased by, and to be made for, the party of the first part shall not become the property of the party of the first part until they are loaded on board cars or vessel, and receipted for by the transportation company.

"(8) It is further agreed that the party of the second part shall make a weekly factory report to the party of the first part; said report to be made out on the Monday following the close of each week, and mailed to the office of the first party. This report to contain a record of the quantity of each size dish made and shipped for the week, and quantity on hand at the end of each week. These reports to be made out on report blanks furnished by the party of the first part.

"(9) The party of the second part agrees to furnish wood dishes additionally in proportion to above-named quantity, at the same prices, and upon the conditions, herein named, if called to do so by the party of the first part.

"(10) Where the words 'wood dishes' are used herein, it is understood that wire-end wood dishes are meant.

"August 28, 1895.                    The National Mercantile Company,
                                          "By W. E. Crume, Sec'y.
                    "By Charles Cravens & Co."

"Supplementary Agreement.

"Between the National Mercantile Company of Dayton, Ohio, party of the first part, and Charles Cravens & Co., party of the second part, to be attached to and become a part of an original agreement between the above parties, dated August 28, 1895:

"(1) Party of the second part, being desirous of obtaining forty-nine shares of the capital stock of the National Mercantile Company, hereby agrees to pay for the same five hundred dollars ($500), to be paid for in wood dishes shipped to the order of the party of the first part, all to be of first quality, and at the prices named in the original agreement of August 28, 1895.

"(2) The value of said dishes to be placed to the credit of the second party on the books of the company, representing its shares in the capital stock of the company.

"(3) Said quantity of dishes in value to be furnished by the party of the second part before the party of the first part shall be required to pay cash for dishes, as specified in section 5 of the original agreement.

"(4) It is agreed, upon the expiration of this agreement or any renewal thereof, that the share of assets of the company, as represented by the shares of stock held by the party of the second part, shall be paid over to the party of the second part.

"(5) This agreement to remain in force and effect during the continuance of the contract between the parties hereto of even date herewith.

"The National Mercantile Company,

"By W. E. Crume, Secretary.

"By Charles Cravens & Co."

"It is hereby agreed, by the parties hereto, that the Carter-Crume Company, a corporation under the laws of West Virginia, agrees to assume, and does hereby assume, to make the above quantity of wood dishes at the prices and upon the conditions above named.

"Dated August 28, 1895.          The Carter-Crume Company,

"By W. E. Crume, Vice President.

"By Charles Cravens & Co."

"Memorandum of agreement made this 28th day of August, 1895, by and between the Carter-Crume Company, a corporation organized under the laws of the state of West Virginia, party of the first part, and Charles Cravens & Co., of Paducah, Kentucky, parties of the second part, referring to a contract and supplementary agreement made this day between the National Mercantile Company, Dayton, Ohio, and Charles Cravens & Co., of Paducah, Kentucky, parties of the second part: Inasmuch as, under the agreement above referred to, Charles Cravens & Co. have become owners of fifty shares of stock in the National Mercantile Company, parties of the first part guaranty to parties of the second part that the dividends paid by the National Mercantile Company to Charles Cravens & Co., on said fifty shares of stock, shall amount to seven hundred and fifty dollars ($750) per month, or a total of nine thousand ($9,000) dollars for the year, ending one year from to-day, or, in the event of such dividends not amounting to such amount, then parties of the first part agree to pay to parties of the second part, on or before one year from to-day, the difference in money between the total amount of dividends paid on said fifty shares of stock and the sum of nine thousand ($9,000); it also being a condition of this agreement that party of the second part is not to manufacture the dishes for the National Mercantile Company, as specified in their contract of this date, referred to above, but such dishes are to be made in fulfillment of said contract by the party of the first part. Party of the first part to receive all money paid by the National Mercantile Company for such dishes.

"Signed August 28, 1895.          The Carter-Crume Company,

"By W. E. Crume, Vice President.

"By Charles Cravens & Co."

Typewritten minutes of the proceedings at a meeting of the directors of the National Mercantile Company attended by the plaintiff on that day, which a witness testified were taken at the time, were offered in evidence by defendant, and, against objection on behalf of the plaintiff, received, which, among other things, stated that it was resolved: "That it is the policy of this company to hold the price on machine-made wire-end wood butter dishes firm at $1.60 basis, and that the secretary be, and is hereby, instructed to use his best endeavor to stop all attempts to manufacture dishes, or the making of machines for the manufacture of wood dishes, and to use coercive measures, if necessary, to accomplish this result." These minutes had never been entered in any record book of the company.

The plaintiff executed his part of the above agreements, and in due time demanded the $9,000, no part of which had been, or was at any time, paid to him. Numerous other contracts between manufacturers of wooden dishes and the National Mercantile Company or the Carter-Crume Company of a similar character, made about the same time, were offered in evidence, and received, against the objection of counsel for plaintiff, who, however, assigned no reasons or grounds for his objection. Some other incidental facts were shown, but the foregoing is the substance of the case as it appeared upon the trial. The trial judge held, at the conclusion of the evidence, that the contracts between the plaintiff, the National Mercantile Company, and the Carter-Crume Company, were not, standing by themselves, unlawful, but that when taken in connection with the other facts, which had been shown, it appeared that they formed part of an unlawful combination in restraint of trade;

that they were therefore contrary to public policy, and could not be enforced. He therefore directed a verdict for the defendant. Counsel for plaintiff duly excepted thereto, and, the verdict and judgment having passed in accordance with the instructions of the court, the case is brought here on writ of error.

Charles W. Baker, for plaintiff in error.

Joseph Wilby, for defendant in error.

Before LURTON, Circuit Judge, and SEVERENS and CLARK, District Judges.

SEVERENS, District Judge, having stated the case as above, delivered the opinion of the court.

The first of the assignments of error relates to the admission in evidence of the contracts between other parties and the National Mercantile Company of a kind similar to that of the plaintiff with the latter company. But no grounds were stated for the objection to their admission, and for that reason, according to the settled rule, error cannot be assigned upon the action of the court receiving them. 8 Enc. Pl. & Prac. 163, and cases cited. It may not be improper, however, to say that no valid reason occurs to us on which the objection could have been based, seeing that those contracts were immediately connected with the contracts in suit, and, all taken together, constitute the entire transaction in which the parties were engaged. The same observation is applicable to contracts between Cravens and the defendant, the Carter-Crume Company, and the National Mercantile Company, which are copied in the preceding statement of facts. They are to be construed as one.

The second assignment relates to the following ruling of the court at the conclusion of the evidence to the jury:

"Now on the face of the papers themselves, I do not think, and I so charge you, that the contracts—the three of them—are against public policy. But there is evidence tending to show that these contracts were a part of a combination or plan entered into between the manufacturers to the extent of eighty per cent. of the output of the country of wooden dishes, by which they each made a contract with a central company, who was to be the selling company, agreeing to sell all their output to that company at cost, taking shares in that company, and allowing that company to fix the market price for the disposition of the goods after they had been transferred to them for sale, and that these contracts were made for the purpose of maintaining prices, and that for the purpose of maintaining prices further they made contracts to limit the production of machines for the making of wooden dishes."

The record proceeds to state: "Whereupon the counsel for plaintiff excepted to that part of the charge of the court touching the contracts as being against public policy." In explanation, it is proper to say that the above ruling was given in charge to the jury in its preliminary instructions. The jury reported a disagreement. Whereupon the court gave them direct instructions to find for the defendant. The latter instruction superseded the former, and opens the whole case.

The third assignment is based upon the exception to the direction of the verdict in favor of the defendant. We cannot, of course, assume, and the court below could not, that any fact was established about which there was room for controversy. All questions of fact

material to the issue, about which different opinions could fairly have been formed, were for the jury; and the question for us is whether upon the facts, which were substantially uncontroverted, including those to which the plaintiff himself testified, the verdict which the court directed was the only one which the court would have allowed finally to stand. Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463, and 43 U. S. App. 408. From the preceding statement of the case as exhibited upon the trial, the material and uncontroverted facts may be gathered into the following synopsis. But first, we lay out of consideration the typewritten minutes of the proceedings at the meeting of the directors of the National Mercantile Company, on August 28, 1896. We think it might well be that the jury would have been justified in sharing the suspicion of counsel for the plaintiff in regard to their genuineness and veracity. It must be admitted that it is most remarkable that any board of directors of a business establishment should pass such a resolution as is quoted in the foregoing preliminary statement, however much in line it might be with their real purposes.

The parties who were engaged in these transactions, of whom the plaintiff was one, representing 80 per cent. of the total product, undertook to, and did in fact, form a combination for the purpose of restricting the production of wooden dishes throughout the country and keeping up the prices thereof. The articles to which this combination had reference were articles in common use. The plaintiff's contracts were part of the means employed for effecting the common object, and he secured the means of sharing in the profits expected to be gained through the combination. To this end all the factories were expected to be brought under the control of the National Mercantile Company, which was to regulate the prices. The plaintiff testified that it was the purpose to close his factory, and not run it at all. He further testified that it was the purpose "to get all the factories in line," in order "to maintain prices." He was guarantied $9,000 for closing his factory for a year, and the contract included all the dish machines that might come into his possession or control, thus disabling himself from manufacturing, and he obligated himself not to sell any wood dishes to any other person, directly or indirectly, during the continuance of the contract. It is manifest that it was the expectation, and that the parties intended, to get a sufficiently large number of manufacturers into the combination to practically accomplish their purpose. We cannot doubt that such a combination, for such purposes, was opposed to public policy, and therefore unlawful. It is the settled doctrine that one cannot maintain a suit in a court of justice upon a contract entered into for the purpose of promoting such objects. The doctrine was elaborately discussed, upon the principles of the common law, by Judge Taft in a case recently decided by this court. U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271. In that case the question was also discussed whether the antitrust law of 1890 was applicable to the contract then under consideration. But the relation of that act to the common law was involved in the discussion, and much research was bestowed upon the established principles of the latter. The proposition there maintained

was that "no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." It was not doubted, nor, indeed, can it be, that where the direct purpose of the contract in suit is to establish, for increasing their profits, a combination among manufacturers and tradesmen whose function is to prevent competition, and thereby prevent the public from obtaining those articles which are in general use, at the prices at which they could be obtained as the result of fair and untrammeled competition, such contract is unlawful, and cannot be enforced. We have, in the foregoing statement of what we suppose to be the conceded rule, restricted it to the case of "articles in general use," in order to indicate a test which is not affected by a feature put forward in some decisions as creating a distinction. We do not commit ourselves upon the question whether such distinction exists or not. The result of the application of the test above formulated to the facts of this case is, manifestly, that the contract here in question cannot be enforced. It is argued by counsel for plaintiff that the contract should be sustained, within the principles stated and approved in U. S. v. Addyston Pipe & Steel Co., upon the theory that the contract upon which the action is based was collateral merely, and did not require the aid of the agreement for combination. But it seems clear to us that this proposition cannot be maintained. This contract was one of the steps in the forbidden organization, and was intended to be one of many by which the objects of the combination were to be accomplished. Seeing what has been the result to the plaintiff, one cannot help feeling that he may have been duped by more artful men. But he was a business man. It is not claimed for him that he was mentally incompetent in any such sense as to absolve him from responsibility for the legal consequences of his acts, and, in such a case as this, the court does not administer equities according to the relative merit of the parties.

We think the court below was right in directing a verdict for the defendant. The judgment is affirmed, with costs.