### GIBBS v. McNEELEY et al.

#### (Circuit Court of Appeals, Ninth Circuit. October 13, 1902.)

#### No. 797.

1. ANTI-TRUST LAW—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.
    To render a combination unlawful under the anti-trust act of 1890 [U. S. Comp. St. 1901, p. 3200], it need not be one which by its terms refers to interstate commerce, but it is sufficient if its purpose and effect are necessarily to restrain interstate trade.

2. SAME.
    An association of manufacturers of and dealers in red cedar shingles in the state of Washington, formed for the purpose of controlling the production and the price of such shingles, which are made only in that state, but are principally sold and used in other states, and which, by its action in closing the mills of its members, has reduced the production, and has also arbitrarily increased the prices at which the product is sold, is a combination in restraint of interstate commerce, and unlawful under the anti-trust law of July 2, 1890 [U. S. Comp. St. 1901, p. 3200].

In Error to the Circuit Court of the United States for the Western Division of the District of Washington.

The plaintiff in error brought an action to recover damages against the defendants in error under the act of congress known as the "Sherman Anti-Trust Act," of July 2, 1890 [U. S. Comp. St. 1901, p. 3200], and alleged in his complaint, as his first cause of action: That for more than 10 years he had

---

¶ 2. See Monopolies, vol. 35, Cent. Dig. §§ 11, 13.

been a dealer in Washington red-cedar shingles at the city of Tacoma in the state of Washington, conducting a general business in such shingles, purchasing them of the various manufacturers thereof within the state of Washington, and selling them to purchasers in other states of the United States and in certain foreign countries. That his business was valuable; and that he was solely dependent upon it for his livelihood, and that he had acquired a wide clientage, and had transacted a business amounting to $100,000 a year, and had derived an annual profit therefrom of $3,000; that the said Washington red-cedar shingle is solely manufactured in the state of Washington, and has become an article of prime necessity and indispensable use to the people in the various states and countries named; and alleged that, during the first 10 months of the year 1899, 4,000,000,000 shingles were manufactured, of which 3,300,500,000 were manufactured for the purpose of selling and delivering to purchasers outside the state of Washington, and were so sold and delivered. That the defendant the Washington Red-Cedar Shingle Manufacturers' Association was a voluntary association of the various manufacturers and dealers in said shingles in the state of Washington, comprising a total of 108; that the association has a constitution and by-laws; that membership is secured by paying a certain initiation fee graded according to the number and character of shingle machines in use by the applicant for membership; that its officers are president, vice president, secretary, treasurer, and a central committee; that the defendants specifically named in the complaint are respectively such officers; that the powers of the committee were to hold meetings "and issue, from time to time, a minimum price below which all members agree not to sell shingles to dealers or wholesalers," "to establish a system of prices at which shingles must be sold to retail dealers," etc., "to order the closing down of all mills, and to take other necessary steps to curtail the output of Washington red-cedar shingles, when in their judgment the supply should exceed the demand." For a second cause of action, the plaintiff in error alleged, in addition to the facts above set forth, that on or about August 15, 1899, the central committee adopted a schedule of prices for shingles, whereby the members of said association were required to and bound themselves to sell at the price so fixed, to wit: Extra A, $1.35 per 1,000, Clears, $1.50 per 1,000, which price the plaintiff alleged was above the market price: the market price then being Extra A, $1.20 per 1,000, and Clears, $1.35 per 1,000. That by reason of the said increase in prices the plaintiff was unable to carry on his business and supply the natural and ordinary demand for such shingles, or to purchase shingles at any other than the price so fixed, and he was injured thereby in his business in the sum of $1,200. For a third cause of action, the plaintiff, in addition to the facts above alleged, set forth that on November 11, 1899, for the purpose of further increasing the price of said shingles, the association ordered its mills to close down for the period of 60 days, which order was obeyed, whereby the trade in shingles was interrupted, and he was unable to purchase shingles with which to fill his orders, to his damage in the sum of $1,000. For a fourth cause of action, in addition to the facts already set forth, the plaintiff alleged that the president, vice president, treasurer, and secretary, together with the central committee, for the purpose of destroying the plaintiff's business, published resolutions adopted at a meeting of the central committee, charging the plaintiff with endeavoring to injure the market for Washington red-cedar shingles, and with having no money invested in his business, and as being without credit and irresponsible, and not an honorable and legitimate dealer in such shingles, and that for the purpose of inducing all wholesale and retail dealers in shingles in the states and foreign countries aforesaid to refuse to buy shingles of the plaintiff, and to induce the manufacturers of shingles to refuse to sell him shingles, they printed and circulated through the mails the said resolutions, and published them in newspapers. And the plaintiff in error set forth in the complaint the names of 253 persons to whom such circulars were sent. He alleged that the result of the conspiracy was to destroy his business, to his damage in the sum of $15,000. On February 2, 1900, the defendants in the action, by their attorneys, filed a general appearance with the clerk on behalf of all the defendants named in the complaint. The defendants McNeeley and Beckman subsequently appeared separately, and

demurred to each cause of action in the complaint for want of jurisdiction of the persons of the defendants, want of jurisdiction of the subject-matter, defect of parties defendant, and the insufficiency of the facts pleaded to constitute causes of action. Upon the last of these grounds of demurrer, the cause was presented in the circuit court before Hanford, District Judge, and the demurrer was sustained as to all except the fourth cause of action. 102 Fed. 594. Upon that cause the case afterward went to trial before Bellinger, District Judge, who directed the jury to return a verdict for the defendants in error upon the ground that the proofs did not sustain the causes of action, and that the combination described in the complaint is not one in restraint of interstate commerce, so as to give a right of action, under the provisions of the act of July 2, 1890 [U. S. Comp. St. 1901, p. 3200], to one who has been injured by a resolution, passed and circulated, denouncing him for cutting prices, and also upon the ground that in the opinion of the court the allegations in the fourth cause of action were insufficient to constitute a cause of action. 107 Fed. 210.

T. O. Abbott and T. L. Stiles, for plaintiff in error.

Charles O. Bates, Charles A. Murray, and John A. McDaniels, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The case having gone to trial before a jury on the fourth cause of action, and having been determined adversely to the plaintiff in error on the facts, and it being conceded that the demurrer to the first cause of action was properly sustained, the question which is here presented is whether the facts alleged in either the second or the third cause of action in the complaint constitute a cause of action under the act of July 2, 1890, commonly known as the "Sherman Anti-Trust Act" [U. S. Comp. St. 1901, p. 3200]. The combination which is described in the complaint consists of a combination of manufacturers and wholesale dealers in Washington red-cedar shingles, who reside and carry on their business within the state of Washington, and sell and deliver goods to residents of other states. It is not charged that the defendants in error, or any of them, have entered into any combination or contract with residents of other states. The alleged right of the plaintiff in error to recover is based substantially upon the fact that the combination comprises all the manufacturers and wholesale dealers within the state of Washington, and that they have combined and conspired together to fix an arbitrary price to wholesale and retail dealers for an article of merchandise used in interstate commerce, below which no one is permitted to buy or to sell, and that the price so fixed marks a distinct increase of the market price as it had stood theretofore, and that the association has assumed and exercised, and will continue to exercise, the power to shut down all mills within the state at will, and for so long a time as it may deem necessary. Is this a combination in restraint of interstate commerce, such as is denounced by the statute? There can be no doubt that at common law it is an unlawful combination in restraint of trade. It has the effect to diminish production, abolish competition, and enhance prices. Its illegality is not relieved by the fact that

it was induced by the keen competition and the unprofitable condition of the shingle manufacturing business which existed before it was entered into, or by the fact that the prices fixed by the combination may have been reasonable. Manufacturing Co. v. Klotz (C. C.) 44 Fed. 721; Richardson v. Buhl, 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457; State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541; People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609; Harrow Co. v. Hench, 27 C. C. A. 349, 83 Fed. 36, 39 L. R. A. 299; Cravens v. Carter-Crume Co., 34 C. C. A. 479, 92 Fed. 479.

The anti-trust act goes as far, if not farther, than the common law, and declares unlawful all combinations in restraint of interstate trade. In order, therefore, to bring the combination which is under consideration within the interdiction of the act, it must appear that it is more than a mere combination in restraint of trade; it must involve the restraint of interstate or international commerce. It is urged by the defendants in error that merchandise is not subject to the power of congress to regulate commerce until it is in actual transit from one state to another, and that matters occurring prior to the commencement of this final movement are not matters of interstate commerce, but are within the authority of the state, and are wholly unaffected by other authority. Coe v. Town of Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; and other cases are cited in support of that view. But in Robbins v. Taxing Dist., 120 U. S. 489, 497, 7 Sup. Ct. 592, 30 L. Ed. 694, it was said: "The negotiation of sales of goods which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce;" and the case of Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, is authority for the proposition that the power of congress to regulate commerce is not confined to goods that have begun their movement out of the state in which they are manufactured, but that it extends to negotiations and contracts made preliminary to the manufacture, sale, and shipment of goods in interstate commerce. The court in that case had under consideration a combination between manufacturers located in different states. The combination comprised six corporations, and it was entered into for the purpose of raising prices of steel pipe in certain designated states. Their method of business required the delivery of pipe by the seller at the place where it was to be used by the buyer, and included in the price the cost of delivery. By the terms of the combination, contracts were to be made, after public letting, at the home and in the state of the buyer. Requests for bids were to be submitted to a central committee, which was to fix a price, and the contract was to be awarded to that member of the combination who would agree to pay, for the benefit of the other members, the largest bonus. This was the method of business except in certain designated reserved states, in which the successful bidder was to be designated, and the price and bonus were to be fixed by the association. The agreement of the association restrained every defendant, except the one selected to receive the contract, from making a contract for pipe with the intended purchaser.

With respect to the sales in the states in which the mills of the defendant were situated, the effect of the agreement was to bind at least three, if not more, of the defendants to make no contract at all in those states for the sale and delivery of pipe in another state. In short, the agreement had the effect to restrain at least three, sometimes four, sometimes five, and sometimes all, of the defendants in interstate trade, which otherwise they would have been permitted to engage in, in selling in one state pipe to be delivered from another state at prices to be determined upon from competition and at market rates. There were other restrictions in the combination, not necessary here to be further specified. The court held that the association was a contract, combination, or conspiracy in restraint of trade, as the terms are understood in the act, and that the subject-matter of the restraint was not articles of merchandise or their manufacture, but contracts for the sale of such articles, to be delivered across state lines, and the negotiations and bids preliminary to the making of such contracts; all of which are interstate commerce. The court said:

"If, therefore, an agreement or combination directly restrains not alone the manufacture, but the purchase, sale, or exchange of the manufactured commodity among the several states, it is brought within the provisions of the statute."

The defendants in error rely upon the case of U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. That case arose upon a bill in equity filed by the United States under the anti-trust act to enjoin the defendants from continuing a combination which comprised substantially all the sugar refineries of the country for refining raw sugar. The bill alleged that the American Sugar-Refining Company had purchased the stock of four other sugar-refining companies with shares of its own, and that thereby it acquired almost the complete control of the manufacture of refined sugar in the United States. It was the object of the suit to cancel the agreements of purchase, to cause the redelivery of the stock to the former owners thereof, and to enjoin the further performance of the agreement. The court denied the relief which was prayed for, and held that the combination was not within the prohibition of the statute for the reason that the agreement related only to the manufacture of refined sugar, and not to its sale. The chief justice, in delivering the opinion of the court, said:

"Commerce succeeds to manufacture, and is not a part of it. The power to regulate commerce is the power to prescribe the rule by which commerce shall be governed, and is a power independent of the power to suppress monopoly. But it may operate in repression of monopoly wherever that comes within the rules by which commerce is governed, or whenever the transaction is itself a monopoly of commerce. * * * The fact that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state, and belongs to commerce."

The chief justice proceeded to say, further:

"What the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several states or with foreign nations, but the contracts and acts of the defendants related exclusively to the acquisition of the Philadelphia refineries and the business of sugar refin-

ing in Pennsylvania, and bore no direct relation to commerce between the states or with foreign nations. The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce. * * * There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce, and the fact, as we have seen, that trade or commerce might be indirectly affected, was not enough to entitle complainants to a decree."

The purport of this language of the court is to mark a distinction between a restraint upon manufacturing and a restraint upon interstate commerce in a manufactured article, and to hold that the power of congress to regulate commerce extends only to the latter. If the defendants in that case had combined for the purpose of not only regulating the manufacture of refined sugar, but the price at which it should be furnished to purchasers in other states, a different case might have been presented. There was nothing in the case as it was presented to show that the combination contemplated a regulation of prices of merchandise which was to enter into interstate commerce, or a restraint of the trade in merchandise in such commerce. There was before the court only a combination to manufacture, which might or might not result in an increase of prices, and the court held, therefore, that commerce was only indirectly affected. Mr. Justice Peckham, in delivering the opinion of the court in the Addyston Pipe & Steel Co. Case, said:

"It is the sale and delivery of a certain kind and quality of pipe, and not the manufacture, which is the material portion of the contract, and a sale for delivery beyond the state makes the transaction a part of interstate commerce,"

—And, distinguishing that case from the E. C. Knight Co. Case, said, of the combination in the latter case, that its direct purpose was the control of the manufacture of sugar; and added:

"There was no combination or agreement in terms regarding the future disposition of the manufactured article, nothing looking to a transaction in the nature of interstate commerce."

In these words the court marked the limit of the doctrine of the E. C. Knight Co. Case. The plain intimation from the language of the court is that, if there had been in that case a combination or agreement in terms regarding the future disposition of the manufactured article across state lines, there would have been added the essential element to make it a combination affecting interstate commerce.

The ground upon which the court held that the combination of manufacturers in the Addyston Pipe & Steel Co. Case restrained interstate commerce was the fact that it was made in contemplation of the transaction of future business between citizens of different states and the negotiation of sales, to be made in one state, of goods to be delivered therein from another. While there was in that case no particular contract for furnishing pipe or fixing its price in the contemplation of the parties to the combination at the time when it was made, the court referred to the fact that it was the purpose of the combination to abolish all competition, and said:

"The direct and immediate result of the combination was, therefore, necessarily a restraint upon interstate commerce in respect of articles manufac-

tured by any of the parties to it, to be transported beyond the state in which they were made."

The present case differs in important aspects from both the E. C. Knight Co. Case and the Addyston Pipe & Steel Co. Case. It occupies a ground intermediate between. The combination which it presents is more than a mere combination to manufacture, such as was before the court in the E. C. Knight Co. Case, and it lacks some of the features of the Addyston Pipe & Steel Co. Case, in that it contains no express provision for the transaction of business across state lines; it does not by its terms refer to the sale or delivery of shingles elsewhere than in the state of Washington. But can it be said that such sales and delivery were not within its contemplation, and are not directly affected by it? The defendants in error were engaged in manufacturing a product of which, as they well knew, more than 80 per cent. was to be sold, delivered, and used in states other than that of its manufacture. They were in the business of selling and delivering shingles to purchasers in other states. In fixing a list of prices they fixed it not alone for domestic trade, but for external commerce as well. The inevitable result of the combination is to enhance the price and restrain the trade of shingles in all the states. In the E. C. Knight Co. Case it was held that a monopoly to manufacture did not necessarily affect interstate commerce. The reason for so holding is apparent. From the creation of a monopoly to manufacture, it does not necessarily follow that interstate commerce in the monopolized article will in any degree be interfered with. The total production of the manufactured article and its price may, notwithstanding the monopoly, remain unaffected. In that case it was said, "There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce." But this cannot be said of a combination of manufacturers in one state who agree to arbitrarily increase the price and diminish the total output of a manufactured product which is made only in that state, but which is principally bought and used in other states. The intention to put a restraint upon interstate commerce in such a case is evident, and the restraint is not indirect, but direct, and it is the necessary and inevitable result of the combination.

We do not think that the act contemplates that the combination therein made unlawful must be one which shall by its terms refer to interstate commerce. It is enough if its purpose and effect are necessarily to restrain interstate trade. If it were otherwise, all combinations in restraint of interstate trade might be so expressed in words as to avoid the statute. The true test would seem to be, not what the agreement professes, but what it accomplishes. This combination must be dealt with in view of the known facts which surrounded it when it was formed, and which still attend it. It is impossible that the parties to it had in view only domestic trade. They must have had in contemplation the market which they had theretofore had, and which they would continue to have, and which, as they well knew, was principally without the limits of their own state. It is immaterial that all the parties to the agreement were residents of the same state. It is not the place where the parties reside that dis-

tinguishes the combination, and lends to it the features of a combination in restraint of interstate trade. A case in point is Chesapeake & O. Fuel Co. v. U. S., 115 Fed. 610, recently decided by the circuit court of appeals for the Sixth circuit, in which the court held illegal under the anti-trust law, both as in restraint of interstate commerce and as tending to create a monopoly, a combination between a fuel company, a corporation of the state of West Virginia, and 14 corporations, persons, and firms of that state, who were independently engaged in producing coal and coke in a district on the line of a railroad. The combination stipulated that the company was to handle for a term of years the entire output of the members of the association, which was to be shipped to the western market over said road, and that it should sell the product of no competing mines, and it provided that a minimum price for the sale of the coal and coke should be fixed from time to time by a committee of the association, which price the fuel company agreed to pay, and in addition thereto agreed to obtain as large a profit as possible, and to account to the association for all thereof above a fixed sum per ton, which it was to retain as its compensation. We have not overlooked certain expressions of the court in the E. C. Knight Co. Case, where it was said that congress did not attempt, by the act of July 2, 1890, "to limit and restrict the rights of corporations created by the states, or the citizens of the states, in the acquisition, control, or disposition of property, or to regulate or prescribe the price or prices at which such property or the products thereof should be sold"; and where it was further said that contracts "to raise or lower prices or wages might unquestionably tend to restrain external as well as domestic trade, but the restraint would be an indirect result, however inevitable and whatever its extent, and such result would not necessarily determine the object of the contract, combination, or conspiracy." We think the court, in using this language, had in view combinations to raise prices which might be made without special reference to interstate trade, and which would only indirectly affect it. The combination in the case before the court is more than a combination to regulate prices; it is a combination to control the production of a manufactured article more than four-fifths of which is made for interstate trade, and to diminish competition in its production, as well as to advance its price. These features, we think, determine its object, and bring it under the condemnation of the law. The plaintiff in error is in the business of buying the manufactured article in the state where it is manufactured, and selling it to purchasers in other states. The acts charged against the defendants in error interfere with his "contracts to buy, sell, or exchange goods to be transported among the several states,"—contracts which are made and negotiated between the plaintiff in error and his customers in various states,—and the acts of the defendants are in restraint of the interstate commerce in which he is engaged. We think the complaint states a cause of action. We find no error in the ruling of the circuit court in denying the motion of the plaintiff in error for an order granting the default of all the defendants in error except E. J. McNeeley and Victor H. Beckman,

and granting Bates & Murray leave to withdraw their general appearance entered on behalf of all of the defendants in error, and to so amend the same as to make said appearance for and on behalf of McNeeley and Beckman only.

The judgment of the circuit court is reversed, and the cause remanded for further proceedings not inconsistent with the foregoing views.