BIGELOW v. CALUMET & HECLA MINING CO. et al. (two cases).

(Circuit Court, W. D. Michigan, N. D. October 3, 1908.)

1. CORPORATIONS (§ 377*)—POWERS—PURCHASING STOCK IN OTHER CORPORATIONS—MICHIGAN MINING STATUTE.

A mining corporation of Michigan may exercise the power to purchase stock of other similar corporations conferred by Pub. Acts Mich. 1905, p. 153, No. 105, although its articles of incorporation do not in terms include such power, the state laws under which it was organized and by which it is governed being expressly subject to amendment or alteration under Const. Mich. art. 15, § 1; and the acceptance of the statutory amendment is sufficiently expressed by the exercise of the power given by the amendment.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1531; Dec. Dig. § 377.*

Acquisition by corporation of stock of other corporation, see note to Anglo-American Land, Mortgage & Agency Co. v. Lombard, 68 C. C. A. 120.]

2. CORPORATIONS (§ 377*)—POWERS—HOLDING STOCK IN OTHER CORPORATIONS.

Pub. Acts Mich. 1905, p. 153, No. 105, which authorizes corporations organized under the mining laws of the state to purchase the stock of any other corporation organized thereunder, does not limit the purpose of such purchases, and the purchasing company may exercise all the lawful rights of a stockholder, including voting the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1531; Dec. Dig. § 377.*]

3. MONOPOLIES (§ 12*)—COMBINATIONS IN RESTRAINT OF TRADE—INTENTION OF PARTIES.

In determining whether a transaction constituted an illegal contract, combination, or conspiracy in restraint of interstate trade or commerce, or to monopolize the same in violation of the Sherman anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), the intention of the parties may or may not be material, depending on whether or not the necessary effect of the agreement or acts done is to directly restrain such trade or to create such monopoly. If not, the intention is important.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

4. MONOPOLIES (§ 12*)—COMBINATIONS IN RESTRAINT OF TRADE—FEDERAL STATUTE.

A combination is not illegal as in violation of the Sherman anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), merely because it may indirectly, incidentally, or remotely restrain interstate trade or tend toward monopoly, if its main purpose and chief effect are to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

promote the business and increase the trade of the parties in a legitimate way.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

5. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—COMBINATIONS BY MINING CORPORATIONS.

The securing by one copper mining corporation, through stock purchases authorized by the laws of the state and proxies obtained from other stockholders, of control over a competing corporation owning and operating adjacent mines, does not necessarily restrain interstate trade or create a monopoly in violation of the Sherman anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), although it is the intention to place the two corporations to a large extent under a common directorate and general control; and such purchase will not be held illegal under the statute because of such facts, where its primary purpose is to secure through friendly co-operation and the joint use of facilities a more economical operation of the mines, especially where the controlled corporation is one of a group previously under a common control and management, and whose products were sold through a common agency; nor does the fact that such purchase will result in the transfer of such agency as to its product to that of the purchasing company tend to unlawfully restrain competition.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

6. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—COMBINATIONS BY MINING CORPORATIONS.

Lake Superior copper of the grade known in the market as "Best Lake" copper is not so distinct from Western copper as a commercial product as to render a combination between two or more of the few companies producing the same unlawful as a monopoly or attempted monopoly of such Best Lake copper, in view of the recently employed process of electrolytic refining which has practically, and to a large extent commercially, eliminated the difference between the Lake and Western products.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

7. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—MICHIGAN STATUTES.

The purchase by one mining corporation of a controlling interest in the stock of another competing corporation held, under the evidence, not unlawful as in violation of Pub. Acts Mich. 1899, p. 409, No. 255, which prohibits combinations for the purpose of preventing competition in "manufacturing, making, transportation," sale or purchase of merchandise, produce or any commodity," or of Pub. Acts Mich. 1905, p. 507, No. 329, which declares illegal all combinations entered into "for the purpose and with the intent of establishing and maintaining, or of attempting to establish and maintain a monopoly."

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

8. MINES AND MINERALS (§ 105*)—CORPORATIONS—POWERS—RESTRICTIONS AS TO REAL PROPERTY—MICHIGAN MINING CORPORATIONS.

The land holdings of a Michigan copper-mining corporation, shown to require 30,000,000 feet of timber per year in its mines, held not so excessive as to be illegal under Pub. Acts Mich. 1907, p. 214, No. 162, relating to mines, which provides that "every corporation organized or existing under this act shall have the power to purchase, hold and convey all such real estate as the purposes of the corporation shall require."

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 229; Dec. Dig. § 105.*]

9. MINES AND MINERALS (§ 105*)—CORPORATIONS—POWERS—RESTRICTIONS AS TO REAL PROPERTY.

In determining whether the land holdings of a mining corporation exceed the statutory limit, which is fixed at the amount the purposes of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the corporation shall require, lands owned by other mining corporations which it controls through stock ownership are not to be taken into account.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 229; Dec. Dig. § 105.*]

For opinion of Circuit Court of Appeals affirming decree, see 167 Fed. 721.

Herbert E. Boynton and Arthur C. Denison, for plaintiff.

Allen F. Rees and Otto Kirchner, for defendant Calumet & Hecla Mining Co.

John E. More, for defendant Osceola Consol. Min. Co.

KNAPPEN, District Judge. In the opinion filed by this court upon the application for a preliminary injunction in the case first above entitled (Bigelow v. Calumet & Hecla Mining Company [C. C.] 155 Fed. 869), the claims of the complainant presented in that cause, as well as the conclusions reached upon the various legal questions there raised, are fully stated. The bill of complaint in the second cause contains, so far as material to this opinion, substantially the same allegations of fact and legal deductions therefrom as the bill in the first cause, except in certain respects to which attention is especially called in this opinion. Briefly summarized, both bills allege in substance that the purchase by the Calumet & Hecla Company of 22,671 shares of stock in the Osceola Company, and the obtaining of proxies in the interest of the Calumet & Hecla Company, for the voting of the stock of other shareholders in the Osceola Company, is an attempt on the part of the Calumet & Hecla Company to monopolize, in part, interstate commerce, in violation of the Sherman act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), to effect a combination for the purpose and with the intent of establishing and maintaining a monopoly of the business of mining, manufacturing, and selling copper, contrary to the Michigan statute against trusts and monopolies, and in violation of the common law relating to monopoly; that such action is part of the general plan of the Calumet & Hecla Company to secure control of practically the entire output of so-called "Lake copper," and thereby to secure a complete and absolute monopoly of such copper throughout the United States; that, in pursuance of said alleged unlawful plan, the Calumet & Hecla Company had also acquired a control of the stock in the Allouez and Centennial Companies (both alleged to be actively competing companies), and of stock interests in a large number of other companies, and was seeking to acquire further controlling holdings of stock in still other actively competing mining companies, notably the Tamarack, Ahmeek, and Isle Royale, which are operated in connection with the Osceola under complainant's management; that the action of the Calumet & Hecla Company in making such stock purchases and in procuring such proxies was ultra vires, illegal, and void; that the Calumet & Hecla Company has obtained and is holding lands greatly in excess of the 50,000 acres allowed by the mining law in force when the

bills were filed; that if the Calumet & Hecla Company shall secure the attempted control of the Osceola Company by the election of a board of directors, it can and will control the Osceola Company in the interest of the Calumet & Hecla Company, and not in the interest of complainant and other stockholders in the Osceola Company.

The bill in the first case (which was filed by complainant in virtue of his stockholding in the Osceola Company) asks an injunction against the voting, at the annual stockholders' meeting, on the part or behalf of the Calumet & Hecla Company, of the Osceola stock held by it, as well as the proxies held in its interest.

The bill in the second case (filed in virtue of complainant's ownership of a small amount of stock in the Calumet & Hecla Company, purchased after the commencement of the first suit, and for the purpose of protecting complainant's interest as an Osceola stockholder) asks a decree declaring the purchases of lands by the Calumet & Hecla Company in excess of 50,000 acres to be illegal, and that such excessive purchases be vacated; that the purchases made of stocks in other mining companies be declared illegal, and that steps be taken for the vacating of the same; that the Calumet & Hecla Company be enjoined from carrying out options and from paying assessments upon, and from purchasing or voting stock in, any other mining company, as well as from soliciting stock proxies in any competing mining company, and from voting stock or proxies before obtained in any such company, as part of a plan for acquiring the management and control of such company; and from buying or carrying out options for the purchase of further lands; and from arranging for joint operations between the Calumet & Hecla, Allouez, Centennial, and Osceola mines, including joint use of shafts; and from hauling, crushing, or smelting the products thereof by the railroads, stamp mills, or smelters of the Calumet & Hecla Company.

This court held, upon the motion for preliminary injunction in the first case, that the 1905 amendment to the Michigan mining law (Pub. Acts Mich. 1905, pp. 153, 154, No. 105) empowered the Calumet & Hecla Company to purchase stock in the Osceola and other companies, subject to the restriction that such purchase be not made with the intent and for the purpose of restraining trade or creating a monopoly; but that a control by way of stock purchase and proxies, if made for that purpose and with that intent, was a violation of the state and federal statutes, which were held broad enough to cover any means purposely adopted for, and manifestly adapted to, the accomplishment of the unlawful purpose; and that the prima facie case presented by the bill, and evidence by way of ex parte affidavits, justified preserving the existing status until full and final hearing upon the merits. The motion for injunction in the second case was never heard.

The conclusion heretofore reached as to the power of the Calumet & Hecla Company to make the stock purchases in question, except so far as prohibited by the anti-trust and anti-monopoly laws, state

or federal, must be adhered to. It is, however, urged by complainant that the exercise by the Calumet & Hecla Company of the power to purchase stock in other mining companies, given by the 1905 amendment to the mining act (Pub. Acts Mich. 1905, p. 153, No. 105), violates the contract between the Calumet & Hecla stockholders as expressed in their articles of incorporation, which do not in terms include such power. Assuming (but not holding) that complainant is entitled to raise the question, the proposition is not, in my judgment, sustainable. The power to make the statutory amendment in question is directly given by section 1, art. 15, of the Constitution of Michigan, which provides for the formation of corporations under general laws, and that "all laws passed pursuant to this section may be amended, altered or repealed." The stockholders are as much bound by this provision as if it had been contained in their articles of incorporation. Attorney General v. Looker, 111 Mich. 498, 69 N. W. 929; Looker v. Maynard, 179 U. S. 46, 21 Sup. Ct. 21, 45 L. Ed. 79; Polk v. Mutual Reserve Fund Life Association, 207 U. S. 310, 28 Sup. Ct. 65, 52 L. Ed. 222. It is doubtful whether this power to purchase stock in another corporation engaged in the same business was such a substantial departure from the purposes of the corporation as expressed in its articles as to require the express acceptance of the amendment by the corporation. Louisville Trust Company v. Louisville, New Albany & Chicago Railway Company, 22 C. C. A. 378, 75 Fed. 433, 448. But if such acceptance was necessary it was, in my judgment, sufficiently expressed by the adoption, after due notice, of a by-law conferring such power upon the directors, by corporate action had thereunder, in the purchase of the stock, and by the subsequent ratification thereof by the stockholders after due notice. Zabriskie v. Cleveland, Columbus & Cincinnati Railway Company, 23 How. 381, 396, 16 L. Ed. 488; Louisville Trust Company v. Louisville, New Albany & Chicago Railway Company, 75 Fed. 488, 22 C. C. A. 378; Venner v. Atchison, Topeka & Santa Fé Railway Company (C. C.) 28 Fed. 581, 587, 589.

It is further urged that the statute should be constructed as authorizing stock purchases for investment only, and not for control. Except so far as this proposition involves the question of conflict with anti-trust and anti-monopoly laws, it is without apparent force. Not only does the statute contain no express limitation to purchases for investment, but the object of the provision, which is apparently to further the active and profitable prosecution of the business of the purchasing corporation by way of holding interests in other corporations carrying on the same or a directly allied business, seems more consistent with the right of active participation in the affairs of the corporation whose stock is purchased than with a mere right of investment without such active participation. The right to vote the stock so purchased is expressly given by the Michigan mining act (2 Comp. Laws Mich. § 7002), and such right is incidental to the ownership of the stock. Rogers v. Nashville, Chattanooga & St. Louis Railway Company, 33 C. C. A. 517, 91 Fed. 312; Taylor v. Southern Pacific Railway Company (C. C.) 122 Fed. 147, 151.

The contention that the acquiring and holding of the stock proxies in the interest of the Calumet & Hecla Company is beyond the power of that company cannot be sustained. The mining act (2 Comp. Laws Mich. § 7002) expressly provides that "stockholders may appear and vote in person, or by proxy duly filed, or by their duly constituted attorneys." No question of the right of the Calumet & Hecla Company to act as the attorney for a stockholder in the Osceola Company is involved, for the corporation does not attempt to so act. But no reason is apparent why a corporation shareholder should not have the same legal right as other shareholders to protect its interest, both by giving and soliciting proxies for effecting a lawful concert of action.

We are thus brought to the consideration of the question whose answer must control the disposition of the first case, viz., whether the purchase of the Osceola stock and the obtaining of the Osceola proxies by the Calumet & Hecla Company have the necessary effect, or were made and done with the intent, to restrain trade or create or maintain a monopoly within the meaning of the law.

And, first, as to the Sherman act. The sections involved here are section 1, which declares illegal "every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations"; and section 2, which declares it a misdemeanor to "monopolize or attempt to or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations."

It is important, at the outset, to consider the intent and purpose of the action complained of; for while it is not necessary to a violation of the act to show affirmatively a specific intent to restrain commerce or create a monopoly, provided such restraint or such monopoly be the direct, immediate, and necessary result of the combination (United States v. Trans-Missouri Freight Association, 166 U. S. 290, 341, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Chesapeake & Ohio Fuel Company v. United States, 53 C. C. A. 256, 115 Fed. 610, 623), yet, as said by Mr. Justice Holmes in Swift & Company v. United States, 196 U. S. at page 396, 25 Sup. Ct. at page 279, 49 L. Ed. 518, "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, a monopoly—but require further acts in addition to the mere forces of nature in order to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen:" and, as said by Mr. Justice Peckham in the Joint Traffic Association Case, in commenting upon the decision in the Trans-Missouri Case, "An unlawful intent in entering into the agreement was held immaterial, but only for the fact that the agreement did in fact and by its terms restrain trade."

In many of the leading cases, both under state statutes and the common law, the express intent to restrain trade or create a monopoly was treated as material, and in some cases controlling. Thus, in Richardson v. Buhl, 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457, the

object of the organization of the Diamond Match Company, which was there held to be a monopoly, was stated to be "to monopolize and control the business of making all the friction matches in the United States and establish the price thereof." In Dunbar v. American Telephone Company, 224 Ill. 9, 79 N. E. 423, 115 Am. St. Rep. 132, the direct object of the purchase by the American Telephone Company (the so-called "Bell monopoly") was alleged to be to put the Kellogg Company out of business, or to so use and control it as to prevent rivalry in business and create a monopoly. In Hunt v. Riverside Cooperative Club, 140 Mich. 538, 104 N. W. 40, 112 Am. St. Rep. 420, the legality of defendant's undertaking was said "to be determined by ascertaining their central and controlling object," which was found to be to create a monopoly in favor of the plumber members.

The facts necessary to be considered in determining the intent and purpose with which the Calumet & Hecla Company made the purchases and entered upon the expansion policy in question are these: The mines of the Calumet & Hecla Company are upon the Calumet conglomerate and the Osceola and Kearsarge amygdaloid lodes, which underlie from the surface in the order named. Until 1904 the Calumet & Hecla Company mined from the conglomerate lode only. Since that year about one-tenth of its output has been taken from the Osceola lode. Only about one-third of that lode (so far as developed on the Calumet & Hecla property) is said to be capable of profitable mining. Upon the Kearsarge lode the Calumet & Hecla Company has thus far done no profitable mining. The conglomerate rock mined by the Calumet & Hecla Company originally yielded 100 pounds of copper to the ton, but the percentage of copper has decreased with the depth at which the vein is mined, until now it yields but little more than 40 pounds. The testimony fairly indicates that the profitable life of the Calumet & Hecla Company, in mining upon the conglomerate lode, at the present rate of production, is about 15 years, and that when this lode is exhausted, unless considerably more territory is secured, the industrial life of the Calumet & Hecla Company will be greatly impaired, and several million dollars worth of equipment and plants rendered in large part valueless. Parts of the Kearsarge lode on the Calumet & Hecla property are barren, the workings of that company yielding from that vein an average of 17 to 18 pounds of copper per ton of rock. To produce the same output from the Kearsarge lode, the Calumet & Hecla Company must mine several times as much rock as on the Calumet conglomerate; and for the reason stated, and in order to use the existing large equipment and conduct mining operations with the present degree of profit, it would be necessary, in working the Kearsarge vein, to mine over a large territory at once.

The Osceola, Centennial, Allouez, and La Salle mines are upon the Kearsarge lode, the mines of the Osceola Company being also upon the Osceola lode. The Osceola Company has worked both the Osceola and Kearsarge veins, producing from both in 1906 about 18½ million pounds of copper. The Allouez and Centennial properties have never been fully developed, the former yielding in 1906 about

3½ million and the latter about 2½ million pounds of copper. In the case of the other companies involved, development has in no case been carried to the point of profitable production. The Centennial immediately adjoins the Calumet & Hecla, a portion of the Osceola lies between and immediately adjoining the Centennial, and the Allouez and another portion of the Osceola lie between and immediately adjoining the Calumet & Hecla and the La Salle, in which the Calumet & Hecla Company has acquired a controlling interest. The Kearsarge lode can be most advantageously worked by the Calumet & Hecla Company, through friendly co-operation with the Osceola, Centennial, Allouez, and La Salle mines, not unusual between mining companies sustaining friendly relations toward each other. Certain abandoned shafts of the Osceola Company are thought by the Calumet & Hecla Company to be available for mining the Osceola amygdaloid lode as well as the conglomerate lode of the Calumet & Hecla property, and certain shafts of the Osceola Company it is thought may ultimately be profitably extended into the Allouez and Centennial workings, and certain shafts upon other properties in which the Calumet & Hecla Company is interested it is believed can be advantageously used in the Osceola Company's territory. The relations between the Calumet & Hecla and the Osceola Companies were not such as to permit co-operation.

Copper production in the Lake region has steadily increased for many years past. In 1906 there were at least 22 producing companies in that region. At least 13 other mining companies were then developing and exploring. The copper-bearing range contains other profitable lodes besides those before named, including the Pewabic (on which the Quincy operates), the Arcadian (worked by the Isle Royale), and the Baltic (on which the Copper Range mines are operated). The Calumet & Hecla ratio of production toward the total Lake production has gradually declined from about 66 per cent. in 1879 to 38 per cent. in 1905, increasing to about 43 per cent. in 1906.

I am convinced, from a careful consideration of the testimony, that the controlling motive and purpose of the Calumet & Hecla Company in acquiring its interest in the mining properties mentioned was to extend its industrial life and keep up and increase, if possible, its production and net earnings, and that the evidence fairly negatives a design thereby to reduce the output of any of the companies, or artificially to increase or maintain the price of the product, or to stifle competition between the related companies, or to prejudice other stockholders generally of either company associated, or to interfere with the integrity of either company, a common management with separate detailed organization being contemplated. The evidence does not indicate that any use of the facilities of the associated companies is contemplated, except upon terms and in manner mutually advantageous. The testimony indicates that the stock of the Osceola, Allouez, and Centennial Companies was bought on the exchange, as the only practicable method of procuring control of those properties; the legislative bill of 1905, authorizing the purchase of stock in other mining companies, having been introduced at the instance of the Calumet & Hecla Company.

The allegation in the bill that the Calumet & Hecla Company was seeking to purchase interests in the Tamarack, Ahmeek, and Isle Royal Companies is not sustained by the evidence, except to this extent: that the Calumet & Hecla Company made an offer for the holdings of complainant and his associates, but only after complainant (having reason to suspect that the Calumet & Hecla Company was buying Osceola stock to obtain control) offered the same for sale, conditioned upon receiving the assurance that the Osceola stock was being bought for control. While this assurance was not given, the fact was neither admitted nor denied.

. It is only just to complainant to say that the charges made against his management of the Osceola Company, to the effect that its product has not been economically manufactured and sold, and that it has not been made to bring the best prices, are shown to be without foundation.

A consideration of the evidence has failed to convince me that the Calumet & Hecla Company is seeking to restrain trade or create a monopoly, unless such monopoly or restraint of trade shall be found to be the necessary result of the control in question over the competing companies involved.

We are thus brought to the question whether the necessary effect of the alleged combination is to restrain trade or create a monopoly. It is settled that a combination does not violate the federal statute merely because it may indirectly, incidentally, or remotely restrain trade or tend toward monopoly. If its necessary effect is to stifle or to directly and substantially restrict interstate commerce, it falls under the ban of the law. On the other hand, if it only incidentally or indirectly restricts competition, while its main purpose and chief effect are to promote the business and increase the trade of the consumers, it is not denounced or voided by that law. United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300; Whitwell v. Continental Tobacco Company, 60 C. C. A. 290, 125 Fed. 454, 64 L. R. A. 689; Chesapeake & Ohio Fuel Company v. United States, 53 C. C. A. 256, 115 Fed. 610, 622; Davis v. A. Booth Company, 65 C. C. A. 269, 131 Fed. 31; Phillips v. Iola Portland Cement Company, 125 Fed. 593, 594, 595, 61 C. C. A. 19.

Is, then, the direct and immediate and necessary effect of the mere fact of control on the part of the Calumet & Hecla Company over the Osceola Company (as obtained by the election of a majority of the board of directors, and thus the power to direct the affairs of the latter company, through the election of officers and otherwise) to restrain trade or create a monopoly within the meaning of the Sherman act?

In United States v. E. C. Knight Company, supra, it was broadly held that a monopoly of manufacturing was not within the prohibition of that law. There the American Sugar Refining Company, being in control of a large majority of the manufactories of refined sugar in the United States, acquired, through the purchase of stock in four Philadelphia sugar refineries, such disposition over those manufactories throughout the United States as gave it practically a monopoly

of the business. It was held that it does not follow that an attempt to monopolize, or the actual monopoly of the manufacture, was an attempt to monopolize commerce, even though, in order to dispose of the product, the instrumentality of commerce was necessarily invoked. Chief Justice Fuller there said (page 16 of 156 U. S., page 255 of 15 Sup. Ct. [39 L. Ed. 325]):

"Contracts, combinations, or conspiracies to control domestic enterprise in manufacture, agriculture, mining, production in all its forms, or to raise or lower prices or wages, might unquestionably tend to restrain external as well as domestic trade, but the restraint would be an indirect result, however inevitable and whatever its extent, and such result would not necessarily determine the object of the contract, combination, or conspiracy."

It is urged, however, that the authority of the Knight Case has been destroyed by subsequent decisions of the Supreme Court. Apart from this question, an examination of the later decisions which are thought to have that effect is of value; for in each of the cases so cited, and in which the effect of the combination in question has been held to be to restrain trade or create monopoly, there is found to have existed some special element (apart from the mere combination of manufacturing companies selling their product in interstate and foreign trade) from which a direct, immediate, and necessary restraint upon competition was found to result.

Thus: By the agreement in question in United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, the adoption of governing rates for all companies interested was directly provided for, and this was the announced purpose of the combination.

In United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, the facts were similar to those in the Trans-Missouri Case. In the Joint Traffic Case, Justice Peckham said:

"To suppose, as is assumed by counsel, that the effect of the decision in the Trans-Missouri Case is to render illegal most business contracts or combinations, however indispensable and necessary they may be, because, as they assert, they all restrain trade in some remote and indirect degree, is to make a most violent assumption, and one not called for or justified by the decision mentioned, or by any other decision of this court."

In Addyston Pipe Company v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, the defendants, who were manufacturers of cast iron pipe, entered into a combination to "raise the price of pipe for all the states west of New York, Pennsylvania, and Virginia, constituting considerably more than three-quarters of the territory of the United States," by "voluntarily agreeing to sell only at prices fixed by their committee"; whereby the defendants were able to "compel the public to pay an increase over what the price would have been if fixed by competition between the defendants." Justice Peckham there said of the Knight Case:

"The plain distinction between manufacture and commerce was pointed out, and it was observed that a contract or combination which directly related to manufacture only was not brought within the purview of the act, although, as an indirect and incidental result of such combination, commerce among the states might be thereafter somewhat affected."

In Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, the Tile, Mantel & Grate Association involved had been organized for the express purpose of creating a monopoly between dealers within a certain radius and the Eastern manufacturers of tile. By reason of the association, plaintiffs were wholly unable to procure at any price tiles from the manufacturers (from whom they had always before bought), or from dealers in San Francisco unless at a price more than 50 per cent. above what members of the association were to pay.

In Swift & Company v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, the case was heard upon demurrer to the bill, which charged a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against, or only in conjunction with, each other, in order to regulate prices in, and induce shipments to, the live stock markets in other states, to restrict shipments, establish uniform rules of grading, make uniform and improper rules of cartage, and to get less than lawful rates from railroads to the exclusion of competitors, with the intent to monopolize commerce among the states. Mr. Justice Holmes, in holding the combination invalid, said, with reference to the alleged restraint of interstate commerce, that:

It "is a direct object, it is that for which the several specific acts and courses of conduct are done and adopted. Therefore the case is not like United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, where the subject-matter of the combination was manufactures, and the direct object monopoly of manufacture within a state. However likely monopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect of such sales."

In Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the combination embraced competing or parallel lines of railroad. These railroads were directly engaged in commerce between the states, and the agreement provided for a prorating of the earnings between the two companies involved, thus effectually restraining competition.

Turning to the cases elsewhere, in which the direct and necessary effect of a given combination has been held to be to restrain trade, there is found to have existed some special element or consideration, apart from the mere combination of manufacturing companies, from which a direct, immediate, and necessary restraint upon competition was held to result.

For example, in Chesapeake & Ohio Fuel Company v. United States, 53 C. C. A. 256, 115 Fed. 610, 14 coal producers of a given district, formerly independent, were compelled to sell at a price fixed by the executive committee or not to sell at all. The executive committee also determined each month what percentage of the total product each member might ship. The rule was expressly recognized that it is not every case of incidental restraint which makes a contract void, the court saying: "But the question is, is it an effect of the contract to directly restrain interstate commerce?"

In Cravens v. Carter-Crume Company, 34 C. C. A. 479, 92 Fed. 479,

a combination of manufacturers of woodenware, representing 80 per cent. of the production of the country, was formed for the purpose of restricting production and keeping up prices, which were to be regulated by the central organization. The direct purpose was held to be to create a monopoly and restrain freedom of commerce.

It is urged that certain remarks found in the opinions of the courts in the Pearsall, Great Northern, Trans-Missouri, Northern Securities, Addyston, and other cases sustain the proposition that a control by one corporation over a competitor creates the tendency and the power to suppress competition, and that this tendency and power operate ipso facto as a direct and immediate restraint upon trade and in the direction of monopoly. The Pearsall Case (161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838) involved the question of fact whether certain acts amounted to a consolidation, lease, purchase, or any form of control on the part of the Great Northern over the Northern Pacific, and thus violated a statute of Minnesota forbidding railroad corporations to "consolidate with, lease, or purchase, or in any way become owner of or control any other railroad corporation, or any stock, franchise or rights or property thereof, which owns or controls a parallel or competing line." The nature of the other cases referred to has been already stated. Considering the remarks referred to in connection with the light of attending facts and the points decided, I find nothing in them sustaining the proposition that the direct, immediate, and necessary effect of a control by a corporation over a competitor, through stock ownership, is to restrain trade or create a monopoly either in manufacturing or selling. On the other hand, it is well settled that individual stockholders may lawfully own a controlling interest in each of two competing companies (Pearsall v. Great Northern Railway Company, 161 U. S. 646, 671, 16 Sup. Ct. 705, 40 L. Ed. 838; Northern Securities Company v. United States, 193 U. S. 361, 362, 24 Sup. Ct. 436, 48 L. Ed. 679), and that the same person may as director lawfully represent two competing companies (Adams Mining Company v. Senter, 26 Mich. 73; Twin-Lick Oil Company v. Marbury, 91 U. S. 587, 23 L. Ed. 328). The fact that Calumet & Hecla officers or representatives are to act as directors in the Osceola Company, whose corporate organization and affairs are to be separately maintained and conducted, affords no presumption that such directors will violate the law or abuse their trusts as directors of the Osceola Company. Any attempt to do so, will, of course, subject them to restraint or correction by the courts. Rogers v. Nashville, C. & St. L. Ry. Company, 91 Fed. 313, 33 C. C. A. 517. Beyond such indirect restraint as is incidental to a common management, it is difficult to see that competition will be necessarily unlawfully restricted. It is true that an opportunity for restricting competition is afforded by the relation; but this is equally true of every case of a common general management; true, for example, of the relations between the Osceola, Tamarack, Ahmeek, and Isle Royale Companies, which have in complainant a common president, who is largely interested as a stockholder; which have a common general management and control; and which own stock in a common smelter, railroad, and chemical works, and sell through a common

agent. In either of the cases presented, "further acts in addition to the mere forces of nature" are required to bring about the restraint of competition beyond such restraint as indirectly, remotely, and incidentally results from the relation of a common management. The practical certainty that under the proposed control the selling of the Osceola product would be taken from the United States Metals Selling Company, and will be sold in connection with that of the Calumet & Hecla Company, and thus under a general Calumet & Hecla management, is urged as necessarily restricting competition. But not only does not the employment of a common selling agent necessarily tend of itself to restrain trade (United States v. Joint Traffic Association, 171 U. S. 567, 19 Sup. Ct. 25, 43 L. Ed. 259), but it would seem that any decrease of competition between the Calumet & Hecla and the Osceola Companies is likely to be offset by new competition between the Osceola on the one hand, the Ahmeek and Tamarack on the other, and by new competition between the Osceola and the United States Metals Selling Company, which now sells two-thirds of the copper product of the United States, including the large output of the competing Amalgamated Copper Company. The conclusion reached is that, whatever may be the remaining authority of the Knight Case as distinguishing between a monopoly of manufacturing and a monopoly of interstate selling, the authorities do not go to the extent of holding that in the absence of intent, or of special features or conditions, every case of control by a manufacturing or a mining corporation over a competitor, through stock ownership and consequent direction of corporate management, creates per se, directly, immediately, and necessarily, a restraint upon trade; and I am not prepared to hold that such is its effect.

It is, however, earnestly and forcefully contended that Lake copper is a commodity so distinct from other copper, and so peculiarly in a class by itself, and that its production is so small and so necessarily limited, that a control by the Calumet & Hecla Company over the Osceola Company will directly and necessarily tend to substantially restrict competition and create a monopoly in Lake copper, and especially in what (as distinguished from Western or Electrolytic copper) is called "best" or "prime" Lake copper; which is alleged to be produced by only a few companies other than the Calumet & Hecla and Osceola (viz., the Quincy, Tamarack, Wolverine, and Ahmeek), and in comparatively small amounts.

It is well settled that a monopoly, in order to be unlawful, need not be complete; and that it may exist although limited to a narrow territory. A combination must, however, in order to violate the law against monopolies, directly, necessarily, and substantially tend toward monopoly. See Whitwell v. Continental Tobacco Company, 60 C. C. A. 290, 125 Fed. 454, 462, 64 L. R. A. 689, where the federal cases on the subject are discussed. As said in the Addyston Case (page 245 of 175 U. S., page 109 of 20 Sup. Ct. [44 L. Ed. 136]):

"It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded."

The important facts relating to this branch of inquiry are these: The record shows that the world's production of copper was in 1906 about 1,600 million pounds, of which the United States was producing about 913 million pounds. Of this last amount about 224 million pounds were produced in the neighborhood of Lake Superior, and is therefore Lake copper. This Lake copper in place differs from most of the other world's copper in that it is "native"—that is to say, it is usually found "free" and substantially pure, the arsenic and other impurities being usually regarded as united with the rock with which the metal is associated; while in most other coppers the metal is carried by an ore, and is directly united with other chemical substances. Until recent years, practically all copper was entirely furnace refined, and by reason of the conditions named the impurities (the most prominent of which was arsenic) were more readily removed from the Lake copper, and a better product obtained than was commercially practicable in the case of copper ores generally. By reason of this fact, and the uniformity of the product of some of the best of the Lake mines, Lake copper acquired and has held a reputation superior to that of Western coppers. By the process of electrolysis, which has, during recent years, been generally employed in the refining of Western coppers, practically absolute purity of product is obtainable, and the production of pure copper is commercially practicable from ores and minerals too arsenical to permit profitably of a high degree of refining by the furnace process alone. As a result of the improvement of this process, much of the Lake copper is now refined electrolytically in whole or in part. The Calumet & Hecla Company refines its highest grade of mineral by the furnace method alone. The other grades are refined by treating a lower grade electrolytically (after first smelting), and mixing the electrolytic product with another grade of mineral not electrolytically treated. By this method the percentage of impurities in the mineral not electrolytically treated is diluted by the purer electrolytic product, the degree of purity being theoretically according to the ratio between the respective degrees of purity and the proportionate amount of the two elements of the mixture. Calumet & Hecla copper, however treated, is of the same grade, is entirely Lake copper, and is sold on the market as best Lake copper (and not as electrolytic), and at one price. The Osceola, Tamarack, and Ahmeek Companies, managed by complainant, mix their minerals with cathodes of Western copper produced by the Boston & Montana Company (one of the constituents of the Amalgamated Copper Company), usually in substantially equal proportions. The resulting product, which is thus practically double the amount of Lake copper used, is sold as "Best Lake," and not as electrolytic (substantially one-half as the property of the Boston & Montana Company), although actually but about one-half Lake. Some of the other Lake coppers are treated electrolytically and sold as Best Lake. Of the 224 million pounds now produced from Lake mineral, the Calumet & Hecla (95 million pounds), Quincy (16 million pounds), Osceola (18½ million pounds), Tamarack (10 million pounds), and Ahmeek (3½ million pounds), are conceded to be Best Lake. The product of seven other mines, producing in the aggregate in 1906 about

24 million pounds, including the Centennial (2¼ million pounds), and the Wolverine (10 million pounds), are fairly shown by the testimony to be capable of being used for all purposes for which Best Lake copper is desired; and no reason is apparent why a large part, if not all, of the remaining Lake product, too arsenical to permit of high refinement by the furnace process alone, cannot be so refined by the use of the electrolytic process.

The production, both of copper generally in the United States as well as at the Lake, has increased steadily year by year, that of the United States having increased from 230 million pounds in 1889 to 913 million pounds in 1906, and that of the Lake region from 80 million pounds in 1889 to 224 million pounds in 1906. By reason of the activity of mining in the Lake district, in the development of both old and new lodes, the production bids fair to increase for some years in the future as rapidly as in the past. Practically all domestic copper, except some of that produced at the Lake, and the bulk of all foreign copper, is electrolytically treated. The object of refining is to obtain purity of product, and the freer it is from arsenic the greater its conductivity. The presence of a small amount of arsenic slightly increases tensile strength. For these reasons copper wire, which consumes about one-half of all the copper used in the United States, is usually made from electrolytic copper, although for some purposes (and perhaps all) certain customers specify Best Lake, which usually, not being entirely electrolytically refined, is apt to carry a little more arsenic than the purely electrolytic. The testimony shows that there is no inherent chemical or physical difference between equally pure furnace refined and electrolytically refined copper, provided the latter is subjected to the same final furnace process, as the testimony indicates it usually is for commercial sale. Electrolytic copper is capable of use for any purpose for which Best Lake is used. Lake copper and electrolytic are sold in direct competition with each other, both in this country and abroad, the Best Lake usually selling, on a normal market, at an average of about one-quarter cent per pound in excess of the best electrolytic. The preference of some purchasers, which results in this difference in price, is probably due, in large part at least, to the long existing reputation of the "Best Lake" for excellence, including uniformity of product, and to the fact that the present high state of electrolytic refining has but lately been reached. Lake copper is not locally consumed or sold. With the improvements in the electrolytic process, and by care in refining, the preference of some consumers for Lake copper is diminishing, and seems likely to disappear in the near future, except so far as it may be based upon the reputation of individual producers. The United States government, which is a large purchaser of copper for various purposes, originally specified Calumet & Hecla alone for cartridge cases. It has lately included Osceola, Tamarack, and Quincy, and has still more lately indicated a willingness to consider the best electrolytic if conforming to tests sustained by samples submitted. The United States government uses for all purposes much less than the amount of the Calumet & Hecla output alone, and in the last five years that com-

pany has sold the government (directly at least) only about one million pounds in the aggregate. It would seem that any attempt to artificially raise the price of Lake copper as against electrolytic would be offset by a larger use of electrolytic.

If the distinction between Lake and electrolytic copper is as sharply defined as complainant claims (and as would seem necessary if the charge of monopoly in Lake copper is to be sustained), in view of the attitude of complainant toward "Lake Copper," as evidenced by his action in causing to be marketed annually over 60 million pounds of copper as "Lake Copper," which is, in fact, to the extent of but about one-half the product of the Lake region, a serious question is raised as to his right to equitable relief against an attempted monopoly in real Lake copper. But it is unnecessary to decide this question, for the conclusion reached, upon consideration of the facts appearing in the record, is that neither Lake copper nor best Lake copper is so far a distinct commodity, and so conspicuously in a class by itself, as to make the control by the Calumet & Hecla Company over the Osceola, Allouez and Centennial Companies directly, immediately, and necessarily tend toward restraint of trade or monopoly in Lake or "best Lake" copper, either generally or against the United States government in particular. The alleged combination not being shown to be made with the intention, or to have the direct, immediate and necessary effect to restrain trade or create monopoly, a violation of the federal law is not, in my opinion, made out.

### As to the Michigan Statutes.

The only provisions which may plausibly be thought to be violated are subdivision 3 of the act of 1899 (Pub. Acts Mich. 1899, No. 255, p. 409), which denounces all combinations for the purpose of preventing competition in "manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity"; and section 2 of the act of 1905 (Pub. Acts Mich. 1905, No. 329, p. 507), which declares illegal all combinations entered into "for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly" of any pursuit or business. The only material respect in which the Michigan statute differs from the federal law is that the Michigan act of 1899 expressly includes combinations in manufacturing. The conclusions reached with respect to the construction of the federal act necessarily forbid relief under the Michigan statutes. In view of the statutory provisions, both state and federal, it is unnecessary to further consider the question of common-law monopoly.

The conclusions reached require a denial of relief under the bill in the first case. The same considerations forbid relief under the bill in the second case, except as to the excessive land holdings; for the only producing mines which have come under the Calumet & Hecla control, aside from the Osceola, are the Centennial and Allouez; and their control has been taken into account in determining the lawfulness of the Osceola stock purchase.

A question is raised as to the right of complainant to relief against the acts complained of, in view of the object of his purchase and the

acquiescence of his assignors in the transactions with respect to which relief is sought. In the view, however, that is taken of the case upon the merits, it is unnecessary to consider this question.

The provisions of the mining act in force when these suits were begun (Pub. Acts Mich. 1907, No. 162, p. 214), provided that "every corporation organized or existing under this act shall have power to purchase, hold and convey all such real estate as the purposes of the corporation shall require." I am unable to assent to the proposition that the land holdings of corporations in which the Calumet & Hecla Company own a stock interest are to be taken into account in determining whether the statutory limit is exceeded. The Calumet & Hecla Company does not, by the mere fact of its stockholding, own lands held by another corporation. When these suits were begun, the Calumet & Hecla Company held over 65,000 acres of land, and owned in addition the timber on 40,000 acres. About 9,000 acres of timber has since been cut and the land allowed to revert. About 12,000 acres contained no timber. About 32,000 acres (containing pine timber too valuable for use in the mines) has been put upon the market for sale. The testimony is to the effect that the present Calumet & Hecla mining operations require about 30 million feet of large timber per year, and that the 50,000 acres remaining are, in the judgment of the company's officers, sufficient only for the conglomerate mining.

Since these suits were begun, the provision referred to has been so amended as to give a mining corporation "power to purchase, hold and convey all such real estate as the purposes of the corporation shall require." Pub. Acts Mich. 1907, No. 162, p. 214. Passing the question raised as to the right of any one other than the public authorities to attack excessive land holdings, I am unable to say, under the evidence, that the judgment of the officers of the company has been wrongfully exercised, and that the Calumet & Hecla Company does not need the amount of land remaining on hand and not upon the market. In view of the amendment of 1907, the court could not properly, upon this record, order a reduction of land holdings, unless found to exceed the requirements of the corporation; and the fact that this statute was passed since the commencement of the suits could at most only affect the question of costs.

The option taken by the Calumet & Hecla Company upon the so-called "Nipagon lands," in Canada, is attacked as ultra vires. The above-cited provisions of the mining law pertaining to the holding of lands impose no limitation as to their location. The permission to purchase stock in other mining companies is expressly extended to "any company organized under this act or any other laws, foreign or domestic" (Pub. Acts Mich. 1905, pp. 153, 154, No. 153); and by 2 Comp. Laws Mich. § 7012, a mining company is expressly authorized to "conduct its mining, smelting or manufacturing business, in whole or in part, at any place or places within the United States, in the territories thereof or in any foreign country," and may conduct such business wholly without the state of Michigan. The Nipagon option is therefore not shown to be ultra vires.

The Calumet & Hecla Company is entitled to a decree in each case, dismissing the bill of complaint with costs.